827 F.2d 653
 56 USLW 2148, Fed. Sec. L. Rep. P 93,355
 Paul R. BUSCH and Linda T. Busch, Plaintiffs-Appellants,
v.
Craig CARPENTER, George R. Jensen, Ronald D. Burnett, and
John Does 1-10, Defendants-Appellees,
Securities and Exchange Commission, Amicus Curiae.
 No. 84-2501.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 18, 1987.
 
 Wallace T. Boyack, of Boyack & Hansen, Salt Lake City, Utah, for plaintiffs-appellants.
 Edward T. Wells, of Bottum & Wells, Salt Lake City, Utah, for defendant-appellee Carpenter.
 Wallace R. Bennett, of counsel, of Callister & Nebeker, Salt Lake City, Utah, for defendants-appellees Jensen and Burnett.
 Rosalind C. Cohen, Asst. Gen. Counsel, S.E.C., Washington, D.C. (Daniel L. Goelzer, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Eric Summergrad, Sp. Counsel, Gerard Citera, Atty., and Paul Gonson, of counsel, Sol., S.E.C., Washington, D.C., with her on brief), for amicus curiae, S.E.C.
 Before SEYMOUR and TACHA, Circuit Judges, and WEINSHIENK, District Judge*.
 SEYMOUR, Circuit Judge.
 
 
 1
 Paul and Linda Busch brought this action under 15 U.S.C. Sec. 77l (1982) against Craig Carpenter, George Jensen, and Ronald Burnett to recover the purchase price of shares of stock in Sonic Petroleum, Inc. Plaintiffs alleged that the stock had not been registered as required by 15 U.S.C. Sec. 77e(a) (1982), and that the stock did not qualify for the intrastate offering exemption set out in 15 U.S.C. Sec. 77c(a)(11) (1982).[1] Plaintiffs also asserted a pendent claim based on the alleged violation of California securities law. The parties filed cross motions for summary judgment, and the district court granted judgment for defendants, 598 F.Supp. 519. We affirm in part, reverse in part, and remand for further proceedings.
 
 I.
 BACKGROUND
 
 2
 The undisputed facts are briefly as follows. Sonic was incorporated in Utah on October 2, 1980. The three defendants were officers and directors of Sonic at its inception. Carpenter was president until May 1981, and a director and officer through June 26, 1981, the date on which plaintiffs bought their shares. Jensen was vice president and a director through June 26. Burnett was secretary and a director until May 1981. During October and November of 1980, Sonic publicly offered and sold shares of Sonic stock to Utah residents through Olsen & Company, Inc. Although Sonic complied with Utah state registration requirements, it did not file a registration statement under federal securities law, relying on the exemption from registration provided for intrastate offerings. Sonic, which had no prior operating history at the time of this offering, was incorporated in Utah and purportedly organized to acquire, extract, and market natural resources such as oil, gas, and coal. Although the company had not undertaken this activity in Utah or anywhere else, it maintained its corporate office, books, and records in Utah at the time of the initial offering. It is not disputed that the offering of 25,000,000 shares of Sonic was sold for $500,000 entirely to Utah residents.
 
 
 3
 In late March or early April of 1981, Carpenter was contacted by William Mason, an Illinois oil and gas promoter, about a merger of Sonic with Mason's operations in Illinois. Sonic and Mason reached an agreement, effective May 25, 1981, under which Sonic issued Mason a controlling block of stock and acquired an Illinois drilling corporation privately owned by Mason. Carpenter, Jensen, Mason, Mason's wife, and their son were officers and directors of the new company, which was renamed Mason Oil Co., Inc. Burnett had resigned his positions with Sonic at the shareholders meeting on the proposed merger, and he took no part in the operation of Mason Oil. Shortly after Mason Oil was formed, William Mason drew $351,126 from the remainder of the $435,000 net proceeds of the original Sonic offering and deposited it in Illinois. This money was not used in Utah.
 
 
 4
 In May 1981, Mason and Carpenter set up Norbil Investments, a brokerage account in Utah, so that Mason and his friends could buy shares of the company's stock. Plaintiffs, who are California residents, bought their stock through Norbil. Plaintiffs also presented evidence of purchases through Norbil of stock by other non-residents between May and August 1981.II.
 
 THE INTRASTATE OFFERING EXEMPTION
 
 5
 Congress enacted the Securities Act of 1933 "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions." SEC v. Ralston Purina Co., 346 U.S. 119, 124, 73 S.Ct. 981, 984, 97 L.Ed. 1494 (1953). In furtherance of this legislative purpose, section 5 of the Act prohibits the offer or sale of any security unless a proper registration statement has first been filed with the SEC. See 15 U.S.C. Sec. 77e (1982). However, Congress also recognized that the protections of the 1933 Act were not essential for those securities that could be supervised effectively by the states. See Chapman v. Dunn, 414 F.2d 153, 157 (6th Cir.1969) (citing S.Rep. No. 47, 73d Cong., 1st Sess. 4 (1933) and H.R.Rep. No. 85, 73d Cong., 1st Sess. 5 (1933)). Section 3(a)(11) therefore exempts from the Act's registration requirements
 
 
 6
 "[a]ny security which is a part of an issue offered and sold only to persons resident within a single State or Territory, where the issuer of such security is a person resident and doing business within or, if a corporation, incorporated by and doing business within, such State or Territory."
 
 
 7
 15 U.S.C. Sec. 77c(a)(11) (emphasis added).[2]
 
 
 8
 In light of the 1933 Act's broad remedial purpose, its exemption provisions are to be narrowly construed. See, e.g., SEC v. Murphy, 626 F.2d 633, 641 (9th Cir.1980); Chapman, 414 F.2d at 159. Once a plaintiff makes out a prima facie case that the securities offered or sold were not registered, the defendant bears the burden of demonstrating its entitlement to an exemption. See SEC v. Ralston Purina Co., 346 U.S. at 126, 73 S.Ct. at 985; Murphy, 626 F.2d at 641; Chapman, 414 F.2d at 159.
 
 A. Coming to Rest
 
 9
 The district court ruled that the resale of stock to non-residents occurred after the issued securities had come to rest in Utah and concluded that the public offering was therefore consummated in Utah within the meaning of section 3(a)(11). On appeal, plaintiffs contend that the court's ruling was erroneous and that the circumstances of the resale defeated the intrastate exemption.
 
 
 10
 In order to fall within the intrastate exemption, initial sales to state residents must be bona fide. The intrastate exemption becomes unavailable whenever sales or purchases by an issuer, an intermediary, or a subsequent purchaser circumvent the federal securities laws. See Capital Funds, Inc. v. SEC, 348 F.2d 582, 586 (8th Cir.1965); SEC v. Hillsborough Investment Corp., 173 F.Supp. 86, 88-89 (D.N.H.1958), aff'd, 276 F.2d 665 (1st Cir.1960); see also Stadia Oil & Uranium Co. v. Wheelis, 251 F.2d 269, 275 (10th Cir.1957). The SEC has consistently maintained that a distribution of securities must have "actually come to rest in the hands of resident investors--persons purchasing for investment and not with a view to further distribution or for purposes of resale." Securities Act Release No. 1459, 11 Fed.Reg. 10,958 (May 29, 1937); accord Securities Act Release No. 4434, 26 Fed.Reg. 11,896 (Dec. 6, 1961). We agree.
 
 
 11
 During the proceedings below, plaintiffs contended that the resale to non-residents within seven months of the initial offering in and of itself precluded the application of the intrastate offering exemption. The Amicus raises a new argument on appeal, contending that because defendants had the burden to show their right to the exemption, they had the burden below to present evidence that the original buyers bought with investment intent. The Amicus argues that without such a showing, summary judgment for defendants was improper. Plaintiffs have abandoned their claim that resale alone was enough to defeat the exemption. They now join in the Amicus argument, and rely on that argument to assert that they are entitled to summary judgment.
 
 
 12
 We reject the Amicus' argument. The intrastate offering exemption requires that the issue be "offered and sold only to persons resident within a single State." 15 U.S.C. Sec. 77c(a)(11). In our view, a seller seeking summary judgment makes a prima facie showing that the offering was consummated within a state by showing that the stock was sold only to residents of that state. We disagree with Amicus that, in order to be entitled to summary judgment, the issuer should be required to disprove all the possible circumstances that might establish the stock has not come to rest. It seems more logical to us to impose on the other party the burden of producing some contrary evidence on this issue when the seller claiming the exemption has satisfied the facial requirement of the statute. In the face of defendants' undisputed showing that all of the original buyers were Utah residents, plaintiffs were therefore required to produce evidence that the stock had not come to rest but had been sold to people who intended to resell it out of state.[3]
 
 
 13
 The evidence fails to suggest that any of Sonic's publicly offered shares were issued under questionable circumstances. Carpenter and Mason did not know each other until their initial conversation in the spring of 1981. Mason's subsequent acquisition of control over Sonic was accomplished strictly by means of recapitalization, not via a tender of shares from the company's public offering. Moreover, the interstate purchases by Mason and others of freely trading shares several months after the completion of the intrastate offering do not, without more, impugn the investment intent of the original buyers or otherwise imply an effort to evade the federal securities laws. Norbil served as a conduit for over-the-counter purchases made by Olsen & Company on behalf of Mason and various acquaintances. Although Carpenter did collect from buyers, pay Olsen, and transfer the stock certificates to their new owners, there is simply no indication that those who sold through Norbil had not originally purchased their stock for investment purposes. This is not a case like Capital Funds, 348 F.2d 582, in which a resident broker received stock without a subscription agreement, paid no consideration, resold to non-residents a few days later, and possibly earned a commission. See also Stadia Oil, 251 F.2d 269 (acquaintance of corporate officers persuaded non-residents to buy from resident broker who had received stock absent consideration and who earned commission on sales); Hillsborough Investment Corp., 173 F.Supp. 86 (stock transferred out of state after being listed in name of resident for 30 days and before offering had closed). Accordingly, the trial court did not err in concluding that no genuine question of fact was raised on whether the issue had come to rest in the hands of Utah residents.
 
 B. Doing Business
 
 14
 Plaintiffs alternatively contend that defendants were not entitled to the intrastate offering exemption because the corporate issuer was not doing business in Utah as required by section 3(a)(11). There is no dispute that the newly formed company, not yet operational, maintained its offices, books, and records in Salt Lake City. The decisive issue concerns whether, under the circumstances of this case, Sonic's failure to invest a portion of the proceeds from its initial public offering in Utah could defeat the intrastate exemption.
 
 
 15
 Although neither the statute nor its legislative history defines the doing business requirement, courts have uniformly held that it refers to activity that actually generates revenue within an issuer's home state. The leading case is Chapman v. Dunn, 414 F.2d 153 (6th Cir.1969), which involved a company that maintained its offices and issued stock in Michigan while operating its sole productive venture, an oil and gas business, in Ohio. The Chapman court reasoned that "doing business" in the context of securities regulation connotes substantially more activity than that which would warrant exercising personal jurisdiction in ordinary civil suits. See id. at 157. Effective supervision of stock offerings, the court added, can entail on-site inspections, familiarity with local economic conditions, and sometimes reliance upon judicial process. Id. at 158. State oversight of business operations located elsewhere could often prove cumbersome, costly, and ineffective. The Chapman court therefore approved the SEC's view that the intrastate exemption applies only in cases of local financing for local industries. See id. at 158-59. The court held that "doing business" refers to income-producing activity, and that an issuer must conduct a "predominant amount" of that activity within its home state. See id. at 159.
 
 
 16
 Cases involving somewhat different facts have reached the same result. SEC v. Truckee Showboat, Inc., 157 F.Supp. 824 (S.D.Cal.1957), involved a California corporation that planned to use the proceeds of an intrastate stock offering to acquire and operate a Nevada hotel. See id. at 825. Although the company had not begun operations beyond maintaining its books and records in California, the intent to invest proceeds elsewhere sufficed to defeat a claim of exemption. See id. In SEC v. McDonald Investment Co., 343 F.Supp. 343 (D.Minn.1972), an established Minnesota corporation that maintained its offices there while doing business elsewhere, planned to invest the proceeds from a local offering in unspecified, out-of-state real estate ventures. See id. at 344. The court recognized that although the company operated outside of Minnesota, all land development agreements would be governed by Minnesota law, and interest income would be earned in Minnesota. See id. at 346-47. Even so, because exemptions from registration are to be narrowly construed, the court reasoned that only local industries may be properly excused. See id. Finally, in SEC v. Asset Management Corp., [1979-1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 97,278, at 96,970 (S.D.Ind.1979), a case similar to Truckee but involving coal leases rather than a hotel, the court flatly limited the intrastate exemption to cases of "local financing by local industries."
 
 
 17
 These cases make clear that an issuer cannot claim the exemption simply by opening an office in a particular state. Conducting substantially all income-producing operations elsewhere defeats the exemption, see Chapman, 414 F.2d at 158-59; McDonald, 343 F.Supp. at 346-47, as do the plans of recently organized companies to invest the net proceeds of initial public offerings only in other states, see Truckee, 157 F.Supp. at 825; Asset Management, [1979-1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 97,278. Doing business under the 1933 Act means more than maintaining an office, books, and records in one state. See Chapman, 414 F.2d at 157.
 
 
 18
 Viewing the evidence and drawing reasonable inferences most favorably to plaintiffs, a fact issue exists regarding whether Sonic's plans for the use of proceeds are distinguishable from the issuers' plans in Truckee and Asset Management. Here the corporation never did more than maintain its office, books, and records in Utah. This was not sufficient to make a prima facie showing of compliance with the intrastate offering exemption. While its prospectus stated that no more than twenty percent of all proceeds would be used outside of Utah, Sonic nonetheless transferred essentially all of its assets to Mason in Illinois. The record contains no evidence, moreover, of any prior efforts whatever at locating investment opportunities within Utah. These considerations support a reasonable inference that Sonic may have been intending all along to invest its assets outside the state. Although Carpenter and Mason may have been strangers to one another, this fact alone fails to dispel the possibility that Sonic had been seeking and perhaps investigating other business operations out of state. If so, and we intimate no view on this unresolved fact question, the intrastate exemption would be unavailable.
 
 
 19
 We are not persuaded by defendants' argument that Sonic did business in Utah when its public offering was consummated, that its stated purpose was to do business within that state, and that the company should not be penalized for reorganizing its operations at a later date. We have already noted that under the Act, doing business means more than opening an office at the time of a public offering. The issue is not whether a newly formed company performs such minimal corporate functions within a state, but whether subsequent proceeds are to be employed in that same state. A newly formed company may not claim the exemption while planning covertly to invest the proceeds of a local offering in other states. As this court has cautioned in a related context, "a person will not be permitted to do indirectly what he cannot do directly." Stadia Oil, 251 F.2d at 275. Accordingly, we conclude that a genuine issue of material fact exists precluding summary judgment in favor of all defendants.
 
 III.
 LIABILITY
 
 20
 Plaintiffs have asserted liability against all three defendants based both on their alleged direct or indirect participation in the sales to plaintiffs, and on their status as controlling persons of the corporation. Defendants Jensen and Burnett contend that they are not liable because they had no involvement with the sale of stock to plaintiffs and did not control the seller. As set forth above, plaintiffs bought their stock through Norbil, a partnership set up by Carpenter, William Mason, and Mason's wife. Norbil obtained the company's stock through the Olsen & Company brokerage firm. Carpenter was a signatory on the Norbil account and bought stock for Mason and his friends in market transactions through Norbil. Carpenter picked up the stock from Olsen & Company out of the Norbil account and transferred it into the names of the purchasers.
 
 
 21
 Section 12 of the 1933 Act imposes strict civil liability upon any person who "offers or sells a security" in violation of the registration requirement of section 5, 15 U.S.C. Sec. 77e. See 15 U.S.C. Sec. 77l. Any such person "shall be liable to the person purchasing such security from him, who may sue either at law or in equity ... to recover the consideration paid." Id. (emphasis added). Although the statutory language implies that only actual sellers may properly be sued, courts have interpreted the statute somewhat more broadly to include situations in which either privity exists between a plaintiff and defendant, or a defendant's actions constitute a "substantial factor" in causing a particular transaction to take place. See Pharo v. Smith, 621 F.2d 656, 666-67 (5th Cir.), remanded in part on other grounds, 625 F.2d 1226 (5th Cir.1980) (per curiam); see also Murphy, 626 F.2d at 649-50. Under either test, a person is not liable if he has in no way facilitated the particular transaction that is the subject of litigation. See Pharo, 621 F.2d at 667 ("not a shred of evidence that [defendant] did anything to bring the ... sale about"); see also Murphy, 626 F.2d at 650 (defendant liable if his acts both necessary to and a substantial factor in particular sales transaction); Lewis v. Walston & Co., 487 F.2d 617, 622 (5th Cir.1973) (defendant's actions a substantial factor in bringing about purchase).
 
 
 22
 Plaintiffs are correct that, under section 15 of the 1933 Act, 15 U.S.C. Sec. 77o, officers or directors may be held liable as "controlling persons" of an issuer or other entity that violates section 5. See San Francisco-Oklahoma Petroleum Exploration Corp. v. Carstan Oil Co., 765 F.2d 962, 964-65 (10th Cir.1985) (per curiam). Section 15, however, must be read in conjunction with section 12. "To establish a Sec. 15 claim, plaintiff must establish that the direct seller is liable under Sec. 12 and that a control relationship existed between the direct seller and the defendant." Dorfman v. First Boston Corp., 336 F.Supp. 1089, 1093 (E.D.Pa.1972) (emphasis added). No such relationship existed in this case. Although Jensen and Burnett might have controlled Sonic at the time of the company's public offering, there is no evidence that they controlled either the individuals who sold to these plaintiffs, or Carpenter, to the extent that he was a substantial factor in bringing the sales about.
 
 
 23
 Defendants Jensen and Burnett, therefore, may not be held liable. Notwithstanding any role they, as officers and directors, played in the company's alleged violation of section 5, neither can fairly be characterized as a seller to these plaintiffs within the meaning of section 12, or as a person controlling the seller within the meaning of section 15. Summary judgment was therefore proper in favor of these defendants.
 
 
 24
 The record does raise fact issues regarding the extent of Carpenter's participation in the sales. Although we express no opinion concerning whether he was a substantial factor in the sales of stock to plaintiffs, summary judgment on this issue is improper.
 
 IV.
 CONCLUSION
 
 25
 In view of our conclusion that fact questions exist on whether the company was doing business in Utah within the ambit of the intrastate exemption and as to Carpenter's liability for any violation of the Act, we reverse in part and remand for further proceedings. The district court dismissed the pendent state claim on the authority of United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), which held that a district court has discretion to dismiss a pendent claim when the federal claim is dismissed before trial. Because we have reversed in part the dismissal of the federal claim, we also reverse the dismissal of the pendent claim.
 
 
 26
 Affirmed in part, reversed in part, and remanded for further proceedings.
 
 
 
 *
 Honorable Zita L. Weinshienk, District Judge, District of Colorado, sitting by designation
 
 
 [1]
 Plaintiffs also alleged that defendants had violated Rule 147, 17 C.F.R. Sec. 230.147 (1986), which is a "safe harbor" provision establishing the circumstances in which the SEC will not challenge the applicability of the intrastate offering exemption. The district court held that defendants' failure to comply with Rule 147 did not preclude them from establishing that they were nonetheless entitled to the exemption. Plaintiffs do not raise this ruling as error on appeal
 
 
 [2]
 Originally part of Sec. 5, 15 U.S.C. Sec. 77e, which contains the 1933 Act's prohibitions concerning securities transactions, the intrastate exemption was later recodified separately by the Securities Exchange Act of 1934. See generally Chapman v. Dunn, 414 F.2d 153, 155-56 (6th Cir.1969)
 
 
 [3]
 In their complaint, motion for summary judgment, and response to defendants' cross motion for summary judgment, plaintiffs consistently asserted that the stock issue had not come to rest only because it had been resold to non-residents within seven months. Plaintiffs did not assert that the original buyers were not Utah residents, or that these purchasers bought intending to resell rather than for investment purposes. Plaintiffs also did not assert that defendants' motion for summary judgment was deficient because defendants had not presented undisputed evidence of the original buyers' investment intent. The intent of the original purchasers was not the focus of the motions below, and allocation of the burden of showing this intent was not raised by the parties or addressed by the district court