C. Frank BRADFORD, et al., Plaintiffs,

v.

Lorin L. MOENCH, Robert B. Beckstead, Snell Olsen, Richard Moench, John M. Taggart, Copper State Thrift & Loan Company, a Utah corporation, Copper State Financial Corporation, a Utah corporation, John & Jane Does, 1–10, Defendants.

No. 87–C–0078–S.

United States District Court,
D. Utah, C.D.

Oct. 26, 1992.

Robert M. Anderson, Ross C. Anderson, and Linda M. Jones, Anderson & Watkins, Salt Lake City, UT, for plaintiffs.

Christopher L. Burton, Michael Patrick O'Brien, Jones, Waldo, Holbrook & McDonough; Henry Nygaard; Denis R. Morrill, Prince, Yeates & Geldzahler; Jeffrey B. Brown, Brown & Brown; John S. Snow; and Ray R. Christensen and Jay Jensen, Christensen, Jensen & Powell, Salt Lake City, UT, for defendants.

## ORDER

SAM, District Judge.

The court has before it the Report and Recommendation of the magistrate judge dated February 25, 1992. There was no timely objection to the Report and Recommendation, other than that filed by the Moench defendants, who have since been dismissed from the case.[1]

The court, having reviewed the matter *de novo*, concurs with the Report and Recommendation of the magistrate judge. The Report and Recommendation contains alternate recommendations with respect to plaintiffs' 12(1) claim. For purposes of this case, the court adopts the magistrate judge's alternate recommendation regarding plaintiffs' 12(1) claim that the relevant offering occurs at the time the securities were *last* offered to the public.

Although the court, for the specific purpose of this case, adopts the alternate recommendation of the magistrate judge, the court is of the view that the Report and Recommendation offers guidance on the issue of whether unregistered securities are, or are not, bona fide offered. The court considers the analysis presented to be extrinsic to the thrust of the briefing and arguments of counsel; however, the thorough, scholarly treatment of this question by the magistrate judge may prove beneficial to other litigants and courts when this question arises in the future.

Accordingly, with the foregoing observations and the reasons stated, the court adopts the Report and Recommendation of the magistrate judge dated February 25, 1992 as the court's own opinion.

BOYCE, United States Magistrate Judge.

Plaintiffs are the purchasers and present owners of thrift certificates, savings passbook, or other accounts issued by the now defunct Copper State Thrift & Loan (CST & L), a Utah industrial loan corporation. Defendants are Copper State Financial Corporation (CSFC) which owned all CST & L stock, individual stockholders of CSFC, and individual directors and officers of CST & L and CSFC. Plaintiffs allege that defendants violated provisions of federal and Utah law including the Securities Act of 1933, the Securities Exchange Act of 1934, the Utah Uniform Securities Act, the Racketeer Influenced and Corrupt Organizations Act (RICO), and the Utah Racketeering Influences and Criminal Enterprise Act (RICE). In addition, plaintiffs allege common law fraud and negligence. The case was referred to the magistrate judge under 28 U.S.C. § 636(b)(1)(B).

Defendants filed a motion to dismiss for failure to state a claim upon which relief can be granted under Rules 12(b) and 9(b) of the Federal Rules of Civil Procedure. Pursuant to the magistrate judge's recommendation, the court denied the motion except as to plaintiffs' claim under section 17(a) of the Securities Act of 1933. The court dismissed plaintiffs' section 17(a) claim. *Bradford v. Moench*, 670 F.Supp. 920 (D.Utah 1987).

After their motion was denied, defendants Lorin L. Moench, Richard Moench, and Moench Investment Co., Ltd. filed a motion for summary judgment (File entry no. 184), which was joined by defendant Robert Beckstead (File entry no. 189). Thereafter, plaintiffs Ernest R. Gates, Linda Gates, Michael W. Edwards, Debra Ed-

---

1. Pursuant to a joint motion of the parties, defendants Lorin L. Moench, Moench Investments and O. Richard Moench were dismissed by order of the court dated September 14, 1992.

wards, Theodore Scharrier, and Marianne Scharrier filed a motion for partial summary judgment against defendant Beckstead on the issue of liability under section 12(1) of the 1933 Act. (File entry no. 199.) This report and recommendation is submitted pursuant to the reference on the cross-motions for summary judgment.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment should be entered if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A party moving for summary judgment bears the initial burden of informing the court of the basis of its motion. It may do so by identifying portions of the record that demonstrate that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In response, the nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. If the nonmoving party fails to meet this burden, summary judgment is mandated. *Id.* In such a case, no genuine issue of material fact exists because a complete failure of proof of an essential element of the party's claim necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552–53.

## II. ABSTENTION

Defendants ask the court to abstain from hearing plaintiffs' claims. In support of their request, defendants cite *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), for the proposition that "federal courts decline to exercise jurisdiction in order to avoid needless conflict with the administration by the state of its own affairs." (See Defs.' Mem.Supp.Summ.J. at 29–31, file entry no. 186; Defs.' Reply Mem. at 28–33, file entry no. 214; Defs.' 2d Suppl.Mem. at 11 n. 2, file entry no. 245.) As additional support for their abstention

argument, defendants cite *Brandenburg v. Seidel*, 859 F.2d 1179 (4th Cir.1988) in which the Fourth Circuit upheld, on the basis of the *Burford* doctrine, a district court's decision to abstain from considering federal RICO and pendent state claims against state financial institutions.

Noting that the Maryland legislature had set up a comprehensive system to rehabilitate and liquidate the ailing savings and loans, the Fourth Circuit stated that the liquidation process would be greatly impeded if more than one decision-making authority was involved. *Brandenburg v. Seidel*, 859 F.2d at 1191. In the court's view, the federal proceedings would disrupt the state effort to provide a unified method for liquidation by interfering with the receiver's efforts to marshal assets and by undermining previous orders of the state receivership court. *Id.* at 1191–92. *See also Tafflin v. Levitt*, 865 F.2d 595, 599–600 (4th Cir.1989) (upholding a similar abstention decision), *aff'd as to unrelated issue*, 493 U.S. 455, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990).

According to defendants, Utah has set up a system for resolving the thrift crisis substantially similar to Maryland's. Based on the *Brandenburg* decision and the *Burford* doctrine, defendants argue that this court should also abstain from hearing plaintiffs' claims in this case.

■ Federal courts have an obligation to adjudicate claims within their jurisdiction. *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans (NOPSI)*, 491 U.S. 350, 356–60, 109 S.Ct. 2506, 2512–13, 105 L.Ed.2d 298 (1989); *Deakins v. Monaghan*, 484 U.S. 193, 203, 108 S.Ct. 523, 530, 98 L.Ed.2d 529 (1988); *Cohens v. Virginia*, 19 U.S. (6 Wheat) 264, 404, 5 L.Ed. 257 (1821). Although abstention is permissible in some cases, it remains the exception, not the rule. *NOPSI*, 491 U.S. at 358, 109 S.Ct. at 2513; *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 236, 104 S.Ct. 2321, 2326, 81 L.Ed.2d 186 (1984); *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).

■ In *Burford v. Sun Oil Co.*, a federal district court was faced with a due process challenge to the validity of an order by the Texas Railroad Commission granting a permit to drill four oil wells. *Burford*, 319 U.S. at 316–17, 63 S.Ct. at 1099. Although the constitutional question was of minimal federal importance, the case required the court to determine whether the Commission had properly applied Texas's complex oil and gas regulations. *Id.* at 331 & n. 28, 63 S.Ct. at 1106 & n. 28.

In addition to conserving an important natural resource, uniform regulation of the oil fields was very important to the Texas economy. *Id.* at 320, 63 S.Ct. at 1100. Because of the importance and complexity of the Texas regulatory scheme, and to prevent the confusion caused by multiple review of the same general issues, the Texas legislature had provided for centralized judicial review of the Commission's decisions in the state courts of Travis County. As a result, the Travis County courts had developed a certain expertise in dealing with problems of oil and gas regulation. *Id.* at 325–27, 63 S.Ct. at 1103–04. Because federal district courts were relatively unsophisticated in these matters, federal review of the Commission's decisions had resulted in confusion, delay, misunderstanding of state law, and needless conflict with state policy. *Id.* at 327, 63 S.Ct. at 1104. Noting that intervention by lower federal courts was almost certain to result in conflicts in the interpretation of state law which would be dangerous to the success of state policies, the Supreme Court concluded that abstention was appropriate. *Id.* at 334, 63 S.Ct. at 1107.

In *NOPSI*, decided shortly after *Brandenburg* and *Tafflin*, the Supreme Court attempted to clarify the *Burford* doctrine:

Where timely and adequate state court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*NOPSI*, 491 U.S. at 361, 109 S.Ct. at 2514 (quoting *Colorado River*, 424 U.S. at 814, 96 S.Ct. at 1244. The Court stated that abstention is not required simply because a complex state regulatory scheme exists, even if there is a potential for conflict with state regulatory law or policy. *NOPSI*, 491 U.S. at 360, 109 S.Ct. at 2514; *Colorado River*, 424 U.S. at 815–16, 96 S.Ct. at 1245–46.

Under the rationale of *Burford* and *NOPSI*, there is no reason for this court to stay its hand. In the first place, the *Burford* doctrine arguably does not apply to this case. In both *Burford* and *NOPSI*, the federal court was required to review a decision of a state administrative agency. Unlike those cases, this court is not called upon to interfere with the proceedings or orders of a state administrative agency.

Moreover, there are no difficult questions of state law at issue in this case. As was the situation in *NOPSI*, plaintiffs' federal claims are not "in any way entangled in a skein of state law that must be untangled before the federal case can proceed." *NOPSI*, 491 U.S. at 361, 109 S.Ct. at 2514 (quoting *McNeese v. Board of Educ. for Community Unit School Dist. 187*, 373 U.S. 668, 674, 83 S.Ct. 1433, 1437, 10 L.Ed.2d 622 (1963). Finally, federal review of the questions presented will not disrupt state efforts to establish coherent policy with respect to the thrift industry. As previously stated, abstention is not required simply because a state regulatory scheme exists. *NOPSI*, 491 U.S. at 360, 109 S.Ct. at 2514; *Colorado River* 424 U.S. at 815–16, 96 S.Ct. at 1245–46. Accordingly, the court should not abstain from exercising jurisdiction in this case.

## III.  DEFINITION OF "SECURITY"

In the prior report and recommendation, the magistrate judge observed that the "linchpin" of plaintiffs' case is whether the

instruments at issue are "securities" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. *Bradford,* 670 F.Supp. at 930.[1]

■ The fundamental purpose of the Securities Acts was to eliminate serious abuses in the securities markets. *Reves v. Ernst & Young,* 494 U.S. 56, 60, 110 S.Ct. 945, 949, 108 L.Ed.2d 47 (1990); *United Hous. Found. Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975). To accomplish that goal, Congress defined the term "security" broadly to encompass the many instruments that might be sold as an investment. *Reves,* 494 U.S. at 60, 110 S.Ct. at 949. However, Congress did not intend to provide a broad federal remedy for fraud. *Id.; Marine Bank v. Weaver,* 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982). In interpreting the term "security," courts should consider the economics of the transaction under investigation and take care not to place form over substance. *Reves,* 494 U.S. at 60, 110 S.Ct. at 949; *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967).

A. *The Family Resemblance Test*

In *Reves v. Ernst & Young,* 494 U.S. 56, 110 S.Ct. 945, the Supreme Court was faced with the question whether certain demand notes issued by a farmers' cooperative were "securities" within the meaning of the Securities Exchange Act of 1934. The Court concluded that they were.

After considering various tests for determining whether a note is a security, the Court adopted the "family resemblance" test. The Court observed that a majority of the courts that had considered the issue had used an investment versus commercial approach. Under that approach, the court seeks to distinguish between notes issued in an investment context (which are "securities") and commercial or consumer notes (which are not "securities"). *Reves,* 494

U.S. at 62, 110 S.Ct. at 950. Noting that the investment versus commercial and family resemblance tests are really two ways of formulating the same general approach, the Court stated that the family resemblance test provides a more promising framework for analysis. *Id.* 494 U.S. at 64, 110 S.Ct. at 951. Consequently, the Court specifically rejected the investment versus commercial test in favor of the family resemblance test. *Id.*

■ Under the family resemblance test, a court begins with a presumption that every note is a security. *Id.* However, the presumption is rebuttable if the note in question bears a strong family resemblance to any of the notes on a judicially created list, deemed not to be securities. *Id.* The following types of notes are not considered to be securities: (1) consumer-financing notes, (2) notes secured by a home mortgage, (3) short-term notes secured by a lien on a small business or its assets, (4) notes evidencing a "character" loan to a bank customer, (5) short-term notes secured by the assignment of accounts receivable, (6) notes formalizing an open-account debt incurred in the ordinary course of business, and (7) notes evidencing loans by commercial banks for current operations. *Id.*

■ The Supreme Court provided four factors to be used in determining whether a note resembles any of the listed notes. First, the court should examine the transaction at issue to assess the motivation that would prompt a reasonable buyer and seller to enter into it. If the seller's purpose is to raise money for a business enterprise or to finance substantial investments and the buyer's purpose is to make a profit, the instrument is probably a security. *Id.* at 64–68, 110 S.Ct. at 951–52. Second, the court should consider the plan of distribution of the instrument to determine whether there is common trading in the instrument for speculation or investment. *Id.* at

---

1. "Security" is defined in section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10). The definition of "security" in section 2(1) of the Securities Act of 1933 is slightly different. See 15 U.S.C. § 77b(1). However, the Supreme Court has consistently held that the definitions in the two acts are virtually identical. *Reves v. Ernst & Young,* 494 U.S. 56, 61 n. 1, 110 S.Ct. 945, 949 n. 1, 108 L.Ed.2d 47 (1990); *Marine Bank v. Weaver,* 455 U.S. 551, 555 n. 3, 102 S.Ct. 1220, 1223 n. 3, 71 L.Ed.2d 409 (1982).

66, 110 S.Ct. at 952. Third, the court should examine the reasonable expectations of the investing public. Instruments may be considered to be securities on the basis of public expectations even where an economic analysis of the particular circumstances surrounding a transaction might suggest otherwise. *Id.* Finally, the court should consider whether "some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Id.* If, based on the foregoing factors, a note does not bear a strong resemblance to one of the enumerated categories, then the court should determine whether another category should be added by examining the same four factors. *Id.*

### B. *The Holloway Decision*

In a case decided prior to *Reves,* the Tenth Circuit Court of Appeals held that thrift certificates and passbook savings certificates issued by a trust company and a finance company were securities within the meaning of the federal securities laws. *Holloway v. Peat, Marwick, Mitchell & Co.,* 879 F.2d 772 (10th Cir.1989), *cert. granted and judgment vacated sub nom. Peat Marwick Main & Co. v. Holloway,* 494 U.S. 1014, 110 S.Ct. 1314, 108 L.Ed.2d 490 (1990), *aff'd on remand,* 900 F.2d 1485 (10th Cir.1990), *cert. denied,* 498 U.S. 958, 111 S.Ct. 386, 112 L.Ed.2d 396 (1990). The court first considered whether the instruments at issue were within the language of the statutory definition of a "security." Noting that passbook savings certificates and thrift certificates are essentially debt instruments which represent a promise by the issuing entity to repay the principal amount with interest at a specified rate after a specified time period or on demand, the court concluded that they fall within the "notes" or "evidence of indebtedness" categories of the statutory definition. *Holloway,* 879 F.2d at 776–77. After reaching this conclusion, the court applied the "commercial/investment" test to determine that the instruments were securities. *Id.* at 779–83.

Because the Tenth Circuit had used the commercial/investment test, the Supreme Court vacated the judgment and remanded for reconsideration under the family resemblance test announced in *Reves. Peat Marwick Main & Co. v. Holloway,* 494 U.S. 1014, 110 S.Ct. 1314, 108 L.Ed.2d 490 (1990). On remand, the Tenth Circuit applied the family resemblance test and affirmed its original opinion. *Holloway v. Peat, Marwick, Mitchell & Co.,* 900 F.2d 1485 (10th Cir.1990).

### C. *Application of the Family Resemblance Test*

After *Reves* and *Holloway,* there can be little doubt that the instruments at issue in this case are securities. The instruments are substantially similar to the instruments at issue in *Holloway,* and thus fall within the statutory definition of a security.

Next, applying the family resemblance test, the court begins with a presumption that the instruments are securities. A comparison with the judicially created list reveals that the instruments at issue bear no resemblance to any of the enumerated instruments. Therefore, the court must apply the four *Reves* factors to determine whether the certificates and accounts represent a new category of instruments that should be added to the list.

#### 1. Motivation

■ Under the first factor, the court must consider the motivation that would prompt a reasonable buyer and seller to enter into the transaction. If the seller is trying to raise money for general business purposes and the buyer is trying to earn money on an investment, then the instrument is most likely a security. *Reves,* 494 U.S. at 64–68, 110 S.Ct. at 951–52.

Defendants point out that if an instrument is exchanged to advance some commercial or consumer purpose, it is less sensibly described as a security. See *Reves,* 494 U.S. at 65, 110 S.Ct. at 952. According to defendants, all parties in the instant case referred to the instruments at issue as "savings deposits." In addition, defendants state that "[c]ertain plaintiffs have

acknowledged herein their own subjective motivations, namely that the instruments at issue here were commercial savings deposit accounts, not investments." (Defs.' 2d Suppl.Mem. at 4.) In support of this assertion, defendants point to statements by two of the plaintiffs at a thrift depositors' meeting held on October 28, 1986 to the effect that they were "depositors," not "investors" or that the transactions were "savings deposits," not "investments." (Defs.' Reply Mem. at 24–25; Tr. of Oct. 28, 1986 meeting at 12, 13, ex. 6 attached to Defs.' Reply Mem.) Further, defendants contend that in the *Holloway* opinion, the Tenth Circuit considered as a significant factor, the parties' express disclaimers that the instruments at issue were "deposits."

In *Reves*, the Supreme Court stated that a transaction should be examined to assess the motivation that would prompt a "reasonable" buyer and seller to enter into it. *Reves*, 494 U.S. at 64, 110 S.Ct. at 951. The use of the word "reasonable" suggests that an objective standard should be used in assessing motivation. Accordingly, the subjective motivation of a particular buyer is not dispositive, especially in a case like this one with a large number of plaintiffs who probably had many different subjective motivations for buying the instruments.

Regarding defendants' reference to the *Holloway* opinion, the *Holloway* court stated that it is appropriate to consider the *issuer*'s characterization of the instrument in question. *Holloway*, 879 F.2d at 781. In *Holloway*, the sellers had characterized the instruments as "investments," expressly disclaiming that they were "deposits." *Id.* The court believed that such a characterization could lead purchasers justifiably to assume that the instruments at issue were subject to the federal securities laws. *Id.* The court did not address the buyers' characterization of the instruments. This suggests the unimportance of individual characterizations.

In determining whether an instrument is a security, the court must consider the economic realities of a transaction. *Reves*, 494 U.S. at 60, 110 S.Ct. at 949; *Forman*,

421 U.S. at 848–49, 95 S.Ct. at 2058–59; *Tcherepnin*, 389 U.S. at 336, 88 S.Ct. at 553. The *Reves* Court observed that where an instrument is sold in an effort to raise capital for general operations and purchased in order to earn a profit in the form of interest, "the transaction is most naturally conceived as an investment in a business enterprise rather than as a purely commercial or consumer transaction." *Reves*, 494 U.S. at 68, 110 S.Ct. at 952–53.

In the instant case, it is undisputed that CST & L's purpose was to raise money for general use in its operations and for loans to its customers. Although some of the plaintiffs in this case may have labelled the transactions as "deposits," the natural conclusion is that a reasonable buyer would purchase the thrift certificates or passbook accounts in order to earn interest on an investment, especially since CST & L offered higher than average interest rates on the accounts. (See Anderson Dep., Ex. 3.) Accordingly, under the first *Reves* factor, the instruments at issue appear to be securities.

### 2. Plan of Distribution

The second factor is the plan of distribution of the instrument. In *Reves*, the Supreme Court stated that where an instrument is offered and sold to a broad segment of the public, that is all that is necessary "to establish the requisite 'common trading' in an instrument." *Reves*, 494 U.S. at 68, 110 S.Ct. at 953. The instruments need not be traded on an exchange. *Id.* See *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985); *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548; *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) (cases involving securities not sold on an exchange). In this case, CST & L offered the certificates and accounts to the general public; and at the time CST & L closed, approximately 1400 people owned CST & L certificates or accounts. (Aff. of Julie Deleeuw ¶ 4, Ex. I to Pls.' Mem.Supp.Part.Summ.J., file entry no. 200.) Defendants have not addressed this factor, apparently conceding that the

requisite "common trading" in the instruments at issue has been established.

### 3. Public Expectation or Perception

██ In considering the third factor, the public's reasonable perceptions, the Court stated that the fundamental essence of a security is its character as an investment. *Reves*, 494 U.S. at 68, 110 S.Ct. at 953. Noting that the *Reves* defendants' advertising had characterized the instruments as "investments," the Court stated that prospective purchasers were entitled to take the sellers at their word. *Id.*

In the instant case, a CST & L pamphlet stated that CST & L offered "higher-than average interest rates. **A good, safe investment.**" (Anderson Dep., Ex. 3) (highlighting in original). In addition, a promotional sheet stated that "our Ultra Passbook is one of the best liquid investments around." (Sutton Dep., Ex. 111.) In their defense, defendants state that the pamphlet was prepared by the Industrial Loan Guarantee Corporation (ILGC), an agency created and monitored by the State of Utah. (Defs.' 2d Suppl.Mem. at 5). However, the fact that the pamphlet was prepared by ILGC does not exculpate the defendants, especially since defendant Beckstead was president of ILGC in addition to being president and a director of CST & L. (Beckstead Dep. at 57, 98).

Defendants argue that despite the existence of the pamphlet, the critical issue under *Reves* is whether there were "countervailing factors" that would lead a reasonable person to question the characterization of the instrument as an investment or security. See *Reves*, 494 U.S. at 68, 110 S.Ct. at 953. According to defendants, countervailing factors in this case require a ruling either that the instruments in question were not securities or that such a determination cannot be made on summary judgment. In support of this contention, defendants refer to the statements by some of the plaintiffs and other depositors at the October 28, 1986 meeting, discussed above, that they were savers, not investors. In addition, defendants state that the Utah statutory provisions which authorized the instruments at issue also expressly excluded them from the definition of thrift securities. See Utah Code Ann. § 7–1–503(3)(a) (1988). Defendants contend that these "countervailing factors" indicate that a reasonable person could not view the CST & L instruments as securities. (Defs.' 2d Suppl.Mem. at 5–6.)

In analyzing this factor, the court must consider the "reasonable" expectations of the investing public. See *Reves*, 494 U.S. at 66, 68, 110 S.Ct. at 952, 953. This is an objective standard. As previously discussed, the subjective perceptions of some of the plaintiffs is not determinative of whether the instruments were securities.

Regarding defendants' contention that the Utah definition of securities excludes the types of instruments at issue, state law does not define "securities" for purposes of the federal Securities Acts. See *Tcherepnin*, 389 U.S. at 337–38, 88 S.Ct. at 553–54; *Holloway*, 879 F.2d at 777 n. 4. See also *Reves*, 494 U.S. at 70–72, 110 S.Ct. at 954–55 (stating that federal, not state, law governs the "maturity" of notes as that term is used in the federal Securities Acts). Therefore, whether the Utah statute excludes the instruments does not govern the question whether the instruments are securities within the meaning of the federal Securities Acts. Furthermore, no evidence suggests that plaintiffs were aware of the alleged statutory exclusion or that it influenced their perception of the instruments at issue.

As discussed above, defendants themselves characterized the instruments as investments. The Tenth Circuit has stated that instruments offered and sold to the general public on the representation that they are good investments are generally deemed to be securities. *Holloway*, 879 F.2d at 781 n. 8. Moreover, the Supreme Court has stated that it is not inappropriate to judge promoters' offerings as being what they were represented to be. *SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 211, 87 S.Ct. 1557, 1562, 18 L.Ed.2d 673 (1967). Under the circumstances, plaintiffs were entitled to take defendants at their word. See *Reves*, 494 U.S. at 68, 110 S.Ct.

at 953. Thus, analysis of the third factor indicates that the instruments at issue were securities.

4. Risk-reducing Factor

■ The final consideration under the family resemblance test is whether a risk-reducing factor, such as the existence of another regulatory scheme, renders the application of the federal securities laws unnecessary. *Reves,* 494 U.S. at 66, 110 S.Ct. at 952. In *Marine Bank v. Weaver,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), the Supreme Court held that a certificate of deposit issued by a federally regulated bank was not a security. The Court concluded that comprehensive federal regulation of the banking industry made the additional protection afforded by the securities laws unnecessary. In reaching that conclusion, the Court emphasized the importance of the fact that the purchaser of an FDIC-insured certificate of deposit is virtually guaranteed payment in full. *Marine Bank,* 455 U.S. at 558, 102 S.Ct. at 1224.

Defendants point out that the *Reves* Court referred to the existence of "another regulatory scheme" as a possible risk-reducing factor, but did not expressly require that such a regulatory scheme be *federal* regulation. (Defs.' 2d Suppl.Mem. at 6.) See *Reves,* 494 U.S. at 66, 110 S.Ct. at 952. Defendants argue that in the instant case, the existence of adequate state regulation akin to the federal regulation in *Marine Bank* supports a conclusion that the instruments at issue are not securities. In addition, defendants point out that unlike the notes at issue in *Reves,* the instruments in the instant case were insured by the ILGC.

Three pre-*Reves* cases support defendants' contention. *See Tafflin v. Levitt,* 865 F.2d at 598–99 (holding that a comprehensive state regulatory and insurance system rendered certificates of deposit issued by a state-chartered savings and loan not securities); *Wolf v. Banco Nacional de Mexico, S.A.,* 739 F.2d 1458, 1463–64 (9th

Cir.1984) (holding that Mexican regulatory scheme rendered Mexican bank certificates of deposit not securities), *cert. denied,* 469 U.S. 1108, 105 S.Ct. 784, 83 L.Ed.2d 778 (1985); *West v. Multibanco Comermex, S.A.,* 807 F.2d 820, 826–27 (9th Cir.1987) (same), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2483, 96 L.Ed.2d 375 (1987). *But cf. Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 756 F.2d 230 (2d Cir.1985) (holding that resale of federally insured certificates of deposit by a broker in the secondary market necessitated the additional protection of federal securities regulation).

However, the argument that the existence of a state regulatory scheme can remove an instrument from the definition of a security was expressly rejected by the Tenth Circuit in *Holloway.* In the first *Holloway* opinion, the court held that in light of the Supremacy Clause, state regulation is insufficient to displace the federal securities laws. Otherwise, states could create their own exemptions.[2] *Holloway,* 879 F.2d at 784. The court concluded that *Marine Bank* permits only other *federal* regulation to displace the securities laws. *Id.* Based on its holding that only federal regulation may be considered, the court stated that "no amount of state regulation is sufficient to satisfy the *Marine Bank* standard." *Id.* at 787. On remand, the court acknowledged that *Reves* did not expressly address whether federal courts should consider state regulation in applying the family resemblance test. *Holloway,* 900 F.2d at 1488. However, the court observed that *Reves* did state that the instruments at issue *"would escape federal regulation entirely if the Acts were held not to apply."* *Id.* (quoting *Reves,* 494 U.S. at 69, 110 S.Ct. at 953) (emphasis provided by the *Holloway* court). The court then reaffirmed its prior holding that the under the Supremacy Clause, state regulatory schemes cannot displace the federal Securities Acts. *Holloway,* 900 F.2d at 1488.

---

**2.** The *Holloway* court distinguished the Mexican bank cases on the ground that the plaintiffs' losses were caused by devaluation of the Mexican currency and not the insolvency of the banks involved. The plaintiffs received the same amount of pesos that they had deposited and their loss was essentially a foreign exchange loss. *Holloway,* 879 F.2d at 785 n. 11.

*See also* Randall W. Quinn, *After Reves v. Ernst & Young, When Are Certificates of Deposit "Notes" Subject to Rule 10b–5 of the Securities Exchange Act?*, 46 Bus. Law. 173 (1990) (concluding that the *Marine Bank* exclusion should not be extended to nonfederal regulation).

Defendants contend that the *Holloway* analysis is inappropriate and should not be applied in this case. (Defs.' Suppl.Mem. at 8.) According to defendants, *Holloway* is factually dissimilar from the instant case because the state regulation at issue in *Holloway* was far less comprehensive than the Utah regulatory scheme. Defendants ask the court to reject *Holloway* or limit it to its own unique facts.

Notwithstanding defendants' arguments, the Tenth Circuit has expressly held that a state regulatory scheme cannot displace the federal securities laws. *Holloway*, 900 F.2d at 1488. In light of the *Holloway* decision, the Utah regulatory scheme simply cannot serve as a risk-reducing factor sufficient to render the protection of the federal securities laws unnecessary.[3] Accordingly, the fourth *Reves* factor also points to a conclusion that the instruments at issue are securities.

5. Conclusion

Under the family resemblance test, the instruments at issue are securities within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934. Accordingly, defendants' motion for summary judgment should be denied on this issue.

D. *Short-term Exclusion*

██ One last comment concerning the definition of securities is in order. Section 3(a)(10) of the 1934 Act excludes from the definition of a security "any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months...." 15 U.S.C. § 78c(a)(10). Similarly, section 3(a)(3) of the 1933 Act exempts these instruments from coverage. 15 U.S.C. § 77c(a)(3). Al-though defendants have not contended otherwise, it should be noted that thrift certificates with maturity dates of less than nine months and passbook savings accounts do not fall within the short-term note exclusion of the Securities Acts.

In *Reves*, the Supreme Court held that demand notes do not necessarily have a maturity of less than nine months. The Court explained that demand notes could be viewed as having either an immediate maturity or an indefinite maturity because demand could be made immediately or many years in the future. *Reves*, 494 U.S. at 72, 110 S.Ct. at 955. In light of the remedial purpose of the statutes, the Court held that the short-term exclusion should not be interpreted to encompass demand notes. *Id.*

In *Holloway*, the Tenth Circuit stated that the maturity date of an instrument or the demand character of passbook certificates is not dispositive because the short-term exclusion was meant to apply only to prime quality commercial paper of a type not ordinarily purchased by the general public. *Holloway*, 879 F.2d at 778–79, 782–83, *citing Zabriskie v. Lewis*, 507 F.2d 546, 550 (10th Cir.1974). Other courts have reached a similar conclusion. *See, e.g., SEC v. American Bd. of Trade*, 751 F.2d 529, 538–40 (2d Cir.1984); *Hunssinger v. Rockford Bus. Credits, Inc.*, 745 F.2d 484, 492 & n. 1 (7th Cir.1984). *See also* Quinn, *supra* at 183–88 (concluding that the short-term exclusion should apply only to certain commercial paper which is not offered to the public as an investment).

E. *Utah Uniform Securities Act*

██ Defendants also argue that plaintiff's claims under the Utah Uniform Securities Act must fail because the Utah Code specifically excludes the instruments at issue from the definition of securities. (Defs.' Mem.Supp.Summ.J. at 47–50.) In support of this argument, defendants point to a provision in the Code dealing with the jurisdiction of the Department of Financial

---

**3.** This is not to say that the regulation in this instance by the State of Utah would be consid-ered adequate to exclude the financial relation-ships from the definition of a security.

Institutions (DFI) to regulate the sale by a financial institution of its own securities which provides as follows:

> (3) "Security" as used in this section does not include:
>
> (a) certificates of deposit or similar instruments issued by a bank, savings and loan association, credit union, or thrift institution authorized or approved by the commissioner under this title. . . .

Utah Code Ann. § 7-1-503 (1988). Defendants contend that section 7-1-503, by its plain terms, vests the DFI with complete jurisdiction over the sale of "securities" by institutions such as CST & L.

As plaintiffs point out, the provision cited by defendants applies only to the jurisdiction of the DFI. It does not exclude certificates of deposit or similar instruments from the provisions of the Utah Uniform Securities Act, Utah Code Ann. §§ 61-1-1 to -30. Like its federal counterpart, the definition of "security" in the Utah Uniform Securities Act is broad enough to cover the instruments at issue. See Utah Code Ann. § 61-1-13(18) (1991 Cum.Supp.). Since the definition of securities in the Utah Uniform Securities Act does not exclude the instruments at issue, the court concludes that they are securities within the meaning of the Act.

## IV. STATUTE OF LIMITATIONS

Defendants contend that plaintiffs' claims under section 12 of the 1933 Act are barred by the statute of limitations.

### A. *Section 12(1) Claims*

Section 12(1) of the 1933 Act provides a remedy for violations of the Act's registration requirements. See 15 U.S.C. § 77*l*(1). The statute of limitations applicable to section 12(1) claims is found in section 13, 15 U.S.C. § 77m. Under the statute of limitations, a section 12(1) claim must be brought within one year after the violation upon which it is based, and in no event, more than three years after the securities were "bona fide offered to the public." 15 U.S.C. § 77m.

### 1. The Parties' Arguments

Defendants contend that the phrase, "bona fide offered to the public," refers to the date that the securities in question were *first* or *initially* offered for sale to the public. (Defs.' Mem.Supp.Summ.J. at 62–65; Defs.' Reply Mem. at 44–55.) According to defendants, the thrift certificates and savings accounts at issue in this case were first offered to the public on August 2, 1977 when CST & L received authority from the State Commissioner of Financial Institutions to issue them. Under defendants' theory, the three-year limitation period began to run at that time. Defendants argue that since the complaint was not filed until January 30, 1987, plaintiffs' claims are barred by the three-year limitations period.

Plaintiffs contend that the phrase "bona fide offered to the public" should be construed to mean the *last* date on which the securities at issue were offered for sale. (Pls.' Mem.Supp.Part.Summ.J. at 83–91.) According to plaintiffs, the last date that CST & L securities were offered to the public was July 31, 1986, the date that CST & L closed it doors. If the statute began to run on that date, the complaint was filed within the three-year time period. Plaintiffs point out that under defendants' construction of the statute, the time limitation would expire before any of the plaintiffs had purchased the securities at issue and before any of their section 12(1) claims had accrued.

Defendants respond that plaintiffs' interpretation of the statute would render the three-year provision meaningless because it would always be preempted by the one-year provision. According to defendants, if a potential plaintiff bought an unregistered security on the last date it was offered to the public, the sale would constitute a violation of section 12(1), thus triggering the one-year period. Consequently, the three-year period would never come into play.

Defendants also contend that their view can be justified on policy grounds. In support of this contention, defendants state that because section 12(1) imposes almost

strict liability, there is a strong policy interest in limiting the time beyond which such liability may be imposed. Concerning plaintiffs' contention that defendants' interpretation of the statute would cut off claims before they accrue, defendants point out that some products liability statutes of repose provide that no claims may be brought after a certain length of time has elapsed following the manufacture or sale of a product. These statutes may also cut off a potential plaintiff's claim before he is injured.

Plaintiffs respond that their interpretation would not render the three-year period meaningless. They point out that securities are often sold privately long after they are no longer offered to the public. Consequently, an investor might buy an unregistered security more than three years after it was last offered to the public. In that situation, the buyer's claim would be barred by the three-year period, even though he filed suit within one year of the violation. (Pls.' Reply Mem. at 16–17.)

In regard to defendants' analogy to products liability statutes, plaintiffs point out that courts have found several of these statutes of repose to be unconstitutional. *See, e.g., Berry by & Through Berry v. Beech Aircraft,* 717 P.2d 670 (Utah 1985) (collecting cases). In addition, plaintiffs argue that defendants' interpretation of the statute of limitations is at odds with any policy to cut off claims that are remote in time from the alleged wrongdoing. Plaintiffs state that applying defendants' interpretation to a products liability case, and assuming a five-year statute of repose, the manufacturer would be immune from suit for injuries caused by any product that was first manufactured in 1970 after 1975. As a result, the claim of an individual who was injured by a product manufactured and sold in 1992 would be time-barred, even though the product was still being manufactured and sold. (Pls.' Reply Mem. at 13–16, file entry no. 222.)

### 2. Unregistered Securities Are Not "Bona fide Offered"

■ The meaning of the phrase "bona fide offered to the public" is unclear. The magistrate judge believes that there is no "bona fide" offering where defendants have failed to comply with the registration requirements. However, at least two courts appear to have considered this possibility and concluded that the "bona fide offered" terminology applies to both registered and unregistered securities. See *Slagell v. Bontrager,* 616 F.Supp. 634, 636–37 (W.D.Pa.1985), *aff'd,* 791 F.2d 921 (3d Cir. 1986); *Morse v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 619, 621–22 (S.D.N.Y. 1977).

The specific issue before the *Morse* court was whether the plaintiffs' section 11 claims were barred by the three-year limitations period. Section 11 imposes liability for filing a false registration statement. The court held that in the case of a false statement, the securities are "bona fide offered to the public" when the registration statement becomes effective. Even though the court was not faced with the question of whether unregistered securities can be "bona fide offered," the court nevertheless concluded that the "bona fide offered" language also applies to unregistered securities. In reaching that conclusion, the court stated that according to Professor Loss, "the phrase is specifically meant to describe a *genuine* rather than simulated offering of securities to the public." *Id.,* citing 4 Louis Loss, *Securities Regulation* 2331 (Supp.1969) [hereinafter 4 Loss]. It should be noted that in the statement quoted by the *Morse* court, Professor Loss is referring to the "bona fide offered to the public" language in the dealer's exemption provision, 15 U.S.C. § 77d(3)(A), rather than the provision at issue in this case. Furthermore, immediately following the quoted statement, Professor Loss states that the emphasis was on "public" and not "first." 4 Loss, *supra,* at 2331.

In *Slagell,* the plaintiff's complaint was barred by the one-year limitation period. Nevertheless, the court addressed the question of whether the complaint was timely under the three-year limitation period. The plaintiff argued that the period starts to run when the security is first *legally* available to the public. The court

disagreed, stating that the period begins to run when the security is first offered to the investor. *Slagell,* 616 F.Supp. at 636–37.

In every case involving the construction of a statute, the starting point is the language of the statute itself. *Landreth,* 471 U.S. at 685, 105 S.Ct. at 2301; *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975). The words in a statute should be given their "ordinary, plain meaning, unless there is a clear congressional intent to the contrary." *See Paluso v. Mathews,* 573 F.2d 4, 9 (10th Cir.1978).

With all due respect to Professor Loss, this court should give the term "bona fide" its common, ordinary meaning of "in good faith," without fraud or deception. *See Ware v. Hylton,* 3 U.S. (3 Dall.) 199, 241, 1 L.Ed. 568 (1796); *M. Lowenstein & Sons, Inc. v. British–American Mfg. Co.,* 7 F.2d 51, 53 (2d Cir.1925); *Weber Showcase & Fixture Co. v. Waugh,* 42 F.2d 515, 521 (W.D.Wash.1930). The phrase "bona fide offered" implies that the offeror has complied in good faith with the requirements of the law. *See Hosmer v. Wallace,* 97 U.S. 575, 581, 24 L.Ed. 1130 (1878) (holding that a bona fide pre-emption claimant was one who "had complied, or was proceeding to comply, in good faith, with the requirements of the law."). Since the offer of unregistered securities is unlawful, it follows that they are not offered in good faith and thus, the "bona fide offered to the public" provision does not apply.

Furthermore, as plaintiffs point out, the words "bona fide offered to the public" are not qualified with any word such as "first" or "initially" and such an interpretation is not within the ordinary meaning of the phrase. As recognized by the court in *In re Bestline Prods. Sec. & Antitrust Litig.,* [1974–75 Transfer Binder] Fed.Sec.L.Rep. (CCH), ¶ 95,070, 1975 WL 386 (S.D.Fla. March 21, 1975), a "first offered" interpretation of "bona fide offered to the public" would encourage nonregistration. Such a policy is contrary to Congress's purpose in enacting the securities laws which was to protect unsophisticated investors from securities fraud. *See Brown v. Producers*

*Livestock Loan Co.,* 469 F.Supp. 27, 32 (D.Utah 1978) (stating that securities laws should be liberally construed to protect innocent investors). Accordingly, this court should hold that since the securities at issue were unregistered, the three-year limitation does not apply.

### 2. First-offered Approach

In the event that the court concludes that the phrase "bona fide offered to the public" applies to unregistered securities, the court must determine when the three-year provision begins to run. In his treatise, Professor Loss states, without discussion, that the phrase "bona fide offered to the public," presumably means *first* offered. Louis Loss, *Fundamentals of Securities Regulation,* 989 (1988) [hereinafter Loss, *Fundamentals of Securities Regulation*]. The majority of courts that have considered the issue have concluded that the phrase refers to the first offering of the security. *See, e.g., In re National Mtg. Equity Corp. Mtg. Pool Certificates Sec. Litig.,* 636 F.Supp. 1138, 1167–68 (C.D.Cal.1986); *Waterman v. Alta Verde Indus., Inc.,* 643 F.Supp. 797, 807–08 (E.D.N.C.1986), *aff'd,* 833 F.2d 1006 (4th Cir.1987); *Morley v. Cohen,* 610 F.Supp. 798, 815–16 (D.Md. 1985); *LeCroy v. Dean Witter Reynolds, Inc.,* 585 F.Supp. 753, 760–61 (E.D.Ark. 1984); *Morse v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 619, 621–24 (S.D.N.Y. 1977).

However, *Waterman* is the only case cited above in which the plaintiff's claims were timely under the one-year provision, but barred by the three-year provision. In the *Morse* case, which dealt with a section 11 claim, the court found that the plaintiffs' claims were timely under the three-year provision. In most of the other cases, the plaintiffs' claims were asserted more than one year after the violation and thus, were barred by the one-year limitation period. Consequently, even though the courts considered the three-year limitation period, the timeliness of the plaintiffs' claims under that provision was not dispositive.

Further, the courts adopting the first-offered approach appear to have started

the running of the three-year limitation period at different times. See *In re National Mtg.*, 636 F.Supp. at 1167–68 (apparently starting the period at time of plaintiff's purchase); *Morley*, 610 F.Supp. at 816 (assuming, for purposes of motion to dismiss, that the statute began to run on the date of purchase where neither party supplied the date that the securities were first offered to the public); *Morse*, 445 F.Supp. at 621–22, 623 (stating that an unregistered security is bona fide offered to the public on the date that trading commenced).

Some of the courts following the first-offered approach did so with misgivings. For example, the court in *LeCroy* observed that under that approach, the claims of any person who purchases a security more than three years after it is first offered to the public are automatically time-barred, no matter how quickly after the sale he files suit. The court noted that this result obviously defeats the purpose of the registration requirements by completely insulating a seller from liability three years after the initial offering. To the extent that this interpretation "permits unscrupulous brokers to act with impunity after the third year following the initial public offering, it undermines the Act's fundamental policy of ensuring that investors possess (or have the opportunity to possess) a modicum of information about the securities they ultimately purchase." *LeCroy v. Dean Witter Reynolds, Inc.*, 585 F.Supp. at 760.

In *Morse*, the court observed that there is an "unquestionable preference, both legislative and judicial, for commencing a limitations period no earlier than the accrual of the cause of action...." *Morse*, 445 F.Supp. at 624. In holding that the plaintiff's section 11 claim was not barred by the three-year provision, the court was "convinced that it could not have been within the legislative intention to have the limitations period commence prior to the accrual of the statutory cause of action." *Morse*, 445 F.Supp. at 623.

### 3. Prior Treatment by This Court

This court has addressed the issue of when the three-year provision begins to run

on two occasions. See *Brown v. Producers Livestock Loan Co.*, 469 F.Supp. 27 (D.Utah 1978); *Boone v. GLS Livestock Management, Inc.*, [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH), ¶ 97,174, 1976 WL 904 (D.Utah April 9, 1976). The *Boone* court believed that in the case of an unregistered security, the relevant offering is made when the security is first offered to the *plaintiff.* *Boone*, [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,174, at 96,486. However, the court found that the plaintiff's section 12(1) claim was barred because it was filed more than one year after the sale of the unregistered security. Accordingly, the court's decision did not turn on the three-year provision.

In *Brown*, the court stated that section 12(1) claims must be brought within one year of the violation and in no event more than three years after the security is issued. *Brown*, 469 F.Supp. at 32. The court noted that there is often a problem pinpointing the date that the violation occurred for statute of limitations purposes. Relying on *Boone*, the court determined that the statute began to run at the time of sale. Because that occurred approximately five years prior to the filing of the complaint, the section 12(1) claim was barred. *Id.* Since the court referred to the time of the "violation," its decision was apparently based on the one-year limitation period rather than the three-year provision.

In addition to *Boone*, at least one other court has taken the position that the three-year limitation period should commence when the security is first offered to the plaintiff. *Slagell v. Bontrager*, 616 F.Supp. 634, 636–37 (W.D.Pa.1985). However, as plaintiffs observe, that interpretation appears to be inconsistent with the express language of the limitations provision.

### 4. Recent Tenth Circuit Treatment

In a recent case, the Tenth Circuit considered whether claims under sections 11 and 12(2) of the 1933 Act were barred by the statute of limitations. *Anixter v. Home–Stake Prod. Co.*, 939 F.2d 1420 (10th Cir.1991), *amended on reh'g*, 947

F.2d 897 (10th Cir.1991). Section 13 contains two slightly different three-year provisions; one applies to section 11 and section 12(1) claims, the other to section 12(2) claims. The pertinent portion of section 13 provides as follows:

> In no event shall any such action be brought to enforce a liability created under section 77k [section 11] or section 77*l*(1) [section 12(1)] of this title more than three years after the security was bona fide offered to the public, or under section 77*l*(2) [section 12(2)] of this title more than three years after the sale.

15 U.S.C. § 77m.

In *Anixter*, defendant Home–Stake Production Company, an Oklahoma corporation, had been in the business of developing oil and gas properties and had sold working interests in various program leaseholds. Each year from 1964 through 1972, Home–Stake established subsidiary corporations known as Program Operating Corporations (POCs), representing separate production programs registered with the SEC which were then sold to the public. Contrary to Home–Stake's representations, the money raised from the sale of the POCs was not used to develop particular oil properties, but was distributed to subsequent POC purchasers as purported income from oil production. In March 1973, plaintiffs filed suit. The court held that the three-year limitation in section 13 barred the claims of plaintiffs who bought the 1964, 1965, 1966, 1967, 1968, and 1969 POCs. The claims of purchasers who bought later POCs were barred by the one-year provision.

The precise question before the court with regard to the claims of the 1964–69 POC purchasers was whether the three-year limitation acts as an absolute bar to suit or whether it is subject to the doctrines of equitable tolling or equitable estoppel. The court held that the three-year provision acts as an absolute bar. *Anixter*, 939 F.2d at 1435–37. In reaching this conclusion, the court did not discuss the difference between the limitation provision applicable to section 11 claims, which runs from the time the security was bona fide offered to the public, and the provision applicable to

section 12(2) claims, which runs from the date of sale. Consequently, the court did not specifically address the meaning of the phrase "bona fide offered to the public." Instead, the court held that the plaintiffs' claims were cut off three years after the date of purchase. *Id.* at 1436.

The court may have found it unnecessary to consider the distinction between the two provisions because each year's POCs apparently were offered to the public and sold in the same year. As a result, the date the securities were first offered, the date they were last offered, and the date of sale were apparently less than a year apart. Because the complaint was filed in 1973, claims based on POCs for the years 1964, 1965, 1966, 1967, 1968, and 1969 would have been barred by the three-year limitation period whether it began to run on the date the securities were first offered, the date they were last offered, or the date of purchase. Although *Anixter* could be interpreted as suggesting that the time a security is bona fide offered to the public is equivalent to the date of sale, it is more likely that the court simply found it unnecessary to address the issue. In any event, *Anixter* is not controlling in the instant case because the Tenth Circuit did not address the meaning of "bona fide offered to the public."

5. Last-offered Approach

■ The better approach, taken by at least two courts, is that the phrase "bona fide offered to the public" means *last* offered to the public. *In re Bestline Prods. Sec. & Antitrust Litig.*, [1974–75 Transfer Binder] Fed.Sec.L.Rep. (CCH), ¶ 95,070, 1975 WL 386 (S.D.Fla. March 21, 1975); *Hudson v. Capital Management Int'l, Inc.*, [1982–83 Transfer Binder] Fed.Sec. L.Rep. (CCH), ¶ 99,221, at 95,896 n. 3, 1982 WL 1384 (N.D.Cal. Jan. 6, 1982). *See also Diskin v. Lomasney & Co.*, 452 F.2d 871, 875–76 (2d Cir.1971) (rejecting a limitations defense under the one-year provision on the ground that it would be unreasonable to start the limitations period "at a date before the action could have been brought—a construction which might lead in some extreme cases to a running of the statute of

limitations before the claim had even arisen.").

The *Bestline* court considered the first-offered interpretation to be at odds with the remedial purpose of the 1933 Act. *Bestline*, [1974–75 Transfer Binder] Fed. Sec.L.Rep. (CCH), ¶ 95,070, at 97,751. In holding that the three-year limitation period began to run on the date the securities were last offered to the public, the court stated as follows:

> To hold as the defendants suggest would be to give individuals a license to sell unregistered securities to whomsoever they wished if they first offered the security to a group of people and, so to speak, "ran the gauntlet" for three years. It is doubtful that Congress intended the 1933 Act's goals of registration, disclosure, and private enforcement to be so easily frustrated.

*Id.*

The reasoning of the *Bestline* court is persuasive, especially in a case such as this one where the issuer contemplated offering the unregistered securities indefinitely. Under the first-offered approach, the issuer would be totally immune from suit after three years, even though it continued to offer the securities for many years into future.

### 6. Conclusion

The federal securities laws should be interpreted in a broad and flexible manner in order to effectuate their remedial purpose. *Tcherepnin*, 389 U.S. at 336, 88 S.Ct. at 553; *Crowley v. Montgomery Ward & Co.*, 570 F.2d 875, 876 (10th Cir.1975). Accordingly, this court should hold that the three-year provision does not apply to unregistered securities because they are not "bona fide offered to the public." Alternatively, the court should hold either that the relevant offering occurs when the security is *last* offered to the public or when the security was first offered to the *plaintiff* as stated by this court's earlier decision in *Boone*. Accordingly, defendants' motion for summary judgment should be denied on this issue.

### 7. Change in Nature of Investment as Offer of New Security

Plaintiffs contend that even if the court holds that the relevant offering is the first offering, their claims were filed within the three-year time limitation. (Pls.' Mem. Supp.Part.Summ.J. at 91–94; Pls.' Reply Mem. at 17–19.) In support of this contention, plaintiffs state that the risk associated with investment in CST & L securities increased so significantly during the three years prior to the filing of the complaint that the accounts and securities offered to the public were fundamentally different investments than those offered prior to that time. As a result, the offering of securities during the three-year period prior to suit constituted the offering of new securities. Since each plaintiff purchased new certificates, invested the proceeds of matured certificates in new certificates, or invested additional amounts in existing accounts during the three-year period, plaintiffs contend that their claims were asserted within three years of the time that the new securities were first offered to the public.

In support of this argument, plaintiffs cite cases stating that significant changes in the rights of a security holder can result in the purchase or sale of a new security. The Second Circuit has stated that in order for changes in the rights of a security holder to qualify as the purchase of a new security, "there must be such significant change in the nature of the investment or in the investment risks as to amount to a new investment." *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978). Other courts have concluded that significant changes associated with a security can constitute the purchase or sale of a new security. See *Smith v. Cooper/T. Smith Corp.*, 846 F.2d 325, 327 (5th Cir.1988) (modification of stock purchase agreement was purchase or sale within the meaning of section 10(b)); *Keys v. Wolfe*, 709 F.2d 413, 416–17 (5th Cir. 1983) (allegation that modification of tree growing and orchard management contracts owned by investors in pecan planta-

tion constituted such a change in investment as to amount to purchase of new security was sufficient to state a claim under section 10(b)); *Diaz Vicente v. Obenauer*, 736 F.Supp. 679, 692–94 (E.D.Va. 1990) (holding letter which modified terms of note to be a security); *Bull v. American Bank & Trust Co.*, 641 F.Supp. 62, 68–69 (E.D.Pa.1986) (allegation that assignment of cattle maintenance contracts changed nature of investment so substantially that it should be considered a sale under section 10(b) was enough to survive motion to dismiss); *Ahern v. Gaussoin*, 611 F.Supp. 1465, 1478–79 (D.Or.1985) (stating that if notes at issue were securities, the exchange of notes after corporate restructuring was such a significant change in nature of investment as to constitute a new investment); *Ingenito v. Bermec Corp.*, 376 F.Supp. 1154, 1178–82 (S.D.N.Y.1974) (allegation that exchange of old notes for new ones and exchange of cattle maintenance contracts constituted sale of new security because it placed investment at additional risk stated a Rule 10b–5 claim).

The issue faced by most of the courts in the above cases was whether a purchase or sale of a new security had occurred within the meaning of section 10 of the 1934 Act, rather than whether a new security had been "offered" for the purpose of the statute of limitations. (*Ahern* also included a section 12 claim under the 1933 Act). However, the principle that a significant change in the nature of an investment can constitute the purchase or sale of a new security seems equally applicable to the question of whether a new security was offered by defendants. Moreover, although defendants argue that they did not offer any new securities during the three-year period, they do not dispute that a significant change in a security can have the effect of creating a new security.

Accordingly, under the interpretation that "bona fide offered to the public" means first offered, plaintiffs' claims may be timely if the nature of the CST & L investments changed so significantly during the three years preceding January 30, 1987 as to constitute the offering of new securities. Since a genuine issue of materi-

al fact exists as to whether such a change occurred, this question cannot be resolved on a motion for summary judgment. Therefore, if the court adopts the first-offered interpretation of "bona fide offered to the public," this matter should be set for trial on the issue of whether the nature of the securities changed so significantly as to constitute the offer of new securities during the three years prior to the filing of the complaint.

**B.  Section 12(2) Claims**

■ Section 12(2) claims must be filed within one year after discovery of the untrue statement or omission, or after discovery should have been made by the exercise of reasonable diligence, and in no event more than three years after the sale. 15 U.S.C. § 77m. Defendants contend that several of the plaintiffs' section 12(2) claims are barred because they were not filed within three years of the sale. According to defendants, the only plausible "sale" in the context of this case is the date that each individual plaintiff opened a savings account or purchased a thrift certificate. Defendants argue that since the complaint was filed January 30, 1987, all claims based on the sale of securities prior to January 30, 1984 are time-barred.

In support of this argument, defendants cite *Sanderson v. Roethenmund*, 682 F.Supp. 205 (S.D.N.Y.1988) which held that the rollover of international certificates of deposit (ICDs) did not constitute new sales within the meaning of the Act. *Sanderson* relied on *Abrahamson* for the proposition that "[b]efore changes in the rights of a security holder can qualify as the purchase of a new security ... there must be such significant change in the nature of the investment or in the investment risks as to amount to a new investment." *Sanderson*, 682 F.Supp. at 209 (quoting *Abrahamson*, 568 F.2d at 868). The *Sanderson* court stated that the rollovers were contemplated by the plaintiffs at the time of initial purchase and that each rollover represented merely a periodic adjustment in the interest rate or maturity date of a single security. *Sanderson*, 682 F.Supp. at 209. As a re-

sult, the court concluded that the automatic rollover of the ICDs was not a significant change in the plaintiffs' investment, and thus, did not constitute the sale of a new security. *Id.*

In the instant case, plaintiffs contend that when they invested the proceeds from mature certificates in new certificates and invested additional funds in passbook accounts, such transactions constituted new "sales" within the meaning of the 1933 Act. Plaintiffs state that unlike the plaintiffs in *Sanderson*, they did not contemplate the automatic rollover of their certificates. Instead, plaintiffs state that on each occasion that they decided to invest the proceeds from a matured certificate in a new certificate, they considered whether some other investment might be more desirable. Plaintiffs assert that each decision to invest at CST & L was based on the favorable interest rates offered by CST & L and their belief that their funds were safe and insured. (Pls.' Suppl.Affs. ¶ 5, ex. G. to Pls.' Mem.Supp.Part.Summ.J.)

Section 2(3) of the 1933 Act defines "sale" as "every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C. § 77b(3). Professor Loss states that "it is clear on the face of the statute that the exchange of one security for another is a sale...." Loss, *Fundamentals of Securities Regulation, supra*, at 247. According to Professor Loss, a change in the interest rate would quite clearly create a new security. *Id.* at 248.

In *SEC v. Associated Gas & Elec. Co.*, 24 F.Supp. 899, (S.D.N.Y.1938), *aff'd* 99 F.2d 795 (2d Cir.1938), a public utility, pursuant to an agreement with investors, extended the maturity date of investment certificates that were about to mature by stamping the existing certificates with a new date. Although the district court noted that the new obligation was virtually identical to the old one, the court concluded that the extension of the maturity date constituted a sale of securities. The court reasoned as follows:

The purpose and aim of the Company is to secure the retention and use of the certificate holders' money for a further period after the present due date, Nov. 15, 1938. Whether on that day the holder takes $80 from his pocket and pays it over to the Company or whether he allows the Company to retain the $80 it has of his money cannot alter the case. In either case, the need of the filing of its statements required under both the Securities Act and the Public Utility Holding Company Act is apparently the same and exactly the same purpose is served by their filing....

*Id.* at 903.

On appeal, the Second Circuit affirmed. *SEC v. Associated Gas & Electric Co.*, 99 F.2d 795 (2d Cir.1938). Reasoning that the investors were, in effect, making a further investment, the court held that the stamping of the certificates with a new date extending their maturity, when accepted by the owner of the certificate, constituted the "sale" of a security. *Id.* at 797.[4] *See also United States v. Riedel*, 126 F.2d 81, 83 (7th Cir.1942) (holding that an exchange of securities is a "sale" within the meaning of the Act).

The decision of the court in *Associated Gas* is more consistent with the language and remedial purpose of the statute than the *Sanderson* decision. In the instant case, plaintiffs gave new value each time they reinvested the proceeds of mature certificates in new certificates or invested additional funds in passbook accounts. Thus, each such transaction constituted a "sale" within the meaning of the Securities Acts. Accordingly, plaintiffs' section 12(2) claims based on purchases made during the three years prior to the filing of the complaint are not time-barred. As plaintiffs concede, additional deposits in passbook accounts opened more than three years prior to suit, do not restart the running of the statute for the entire amount in the account, but only for the additional amounts deposited.

**4.** Although the case was decided under the Holding Company Act, 15 U.S.C. § 79b(a)(23), Professor Loss states that "it is impossible to read the opinion without concluding that its rationale applies equally to the Securities Act." Loss, *supra*, at 247–48 n. 3.

## C. *Utah Uniform Securities Act*

The statute of limitations under the Utah Uniform Securities Act provides that claims must be brought within four years of the "act or transaction constituting the violation...." Utah Code Ann. § 61-1-22(5) (1989). Defendants contend that certain of plaintiffs' claims are barred under the Utah statute because the sales occurred more than four years prior to the filing of the complaint.

As defendants point out, the Utah Act is generally read and interpreted in a manner similar to the federal securities laws. *See Payable Accounting Corp. v. McKinley*, 667 P.2d 15, 17–18 (Utah 1983). Since the rollovers of certificates and the investment of additional funds in passbook accounts resulted in "sales" under the federal acts, such transactions were also "sales" within the meaning of the Utah Act. Accordingly, the Utah statute of limitations does not bar plaintiffs' state claims.

## V. STATE RESPONSIBILITY

■ Defendants argue that their conduct which allegedly injured plaintiffs was done by order of the State of Utah under threat of civil and criminal sanctions. Defendants state that the DFI ordered them to stay in business, continue accepting deposits, and prohibited them from making any disclosures to depositors. According to defendants, a regulated business's compliance with a directive or order from a regulating governmental body is a valid and complete defense to any injury which results from such compliance. Defendants contend that since they obeyed the State's orders, they cannot be held liable for doing so. Furthermore, defendants state that they were actually controlled by the DFI, citing authority for the proposition that a corporation cannot be held liable for its torts when the government has deprived it of control over its operations. (See Defs.' Mem.Supp.Part.Summ.J. at 50–57.)

Plaintiffs dispute defendants' assertions that the State ordered them not to disclose risks to depositors and that they faced civil and criminal penalties for doing so. Plaintiffs state that there were only two prohibitions relating to disclosure of information: (1) no one may make a false statement derogatory to the condition of a financial institution; and (2) reports received or prepared by the DFI, information obtained from institutions or persons under the jurisdiction of the DFI, and orders and related records of the DFI are not open to the public. See Utah Code Ann. § 7-1-801, 802 (1988). However, if the institution that is the subject of the report authorizes disclosure, disclosure is not prohibited. Utah Code Ann. § 7-1-802(3)(e) (1988).

Plaintiffs concede that Commissioner Weis (Commissioner of the DFI) instructed a DFI examiner to tell certain thrift officers not to disclose information relating to the imminent closure of the thrifts. (Weis Dep. Vol. II at 154–56.) However, plaintiffs state that there is nothing in the record to indicate that any state regulator prohibited the filing of a registration statement with respect to CST & L securities or that thrift officers were ordered not to disclose risks of loss to depositors during the years prior to July 31, 1986. Further, plaintiffs argue that there was no prohibition against disclosure of truthful information by industrial loan corporations concerning the condition and operation of the thrifts, the thrift industry generally, or the risks to depositors.

In support of their position, plaintiffs point to the following testimony by Commissioner Weis:

Q. To your knowledge, were there any prohibitions against thrifts making disclosures in addition to those made in this pamphlet or pamphlets of this type?

. . . .

A. There would be prohibitions against them making disclosures of any information they had received from the department.

Q. Do you know of any other prohibitions against disclosures being made by industrial loan corporations?

A. Not if they were truthful. There's no prohibitions against making disclosures unless they're false statements

or it's information obtained from the department.

Q. There's nothing that you know of that would have prevented thrifts from disclosing the true nature of the net worth certificates?

. . . .

... Is there anything that would have prohibited the thrifts from affirmatively disclosing, say, in pamphlets containing certain financial information that were provided to depositors?

A. Not anything in the law.

Q. Anything from the department? Anything that the department prohibited or attempted to prohibit regarding disclosures?

A. No.

. . . .

Q. Was there anything, to your knowledge, that prohibited thrifts in the State of Utah from disclosing to depositors or potential depositors the fact that the ILGC fund was inadequate and that the strongest, financially strongest members of the ILGC were leaving or were about to leave the ILGC and obtain FDIC insurance?

. . . .

... I'm asking, is there anything that you know of that would have prohibited it, regulatorywise, [sic] under the law, any edict that came out of your office, anything to that effect?

. . . .

A. Okay. To my knowledge, there was nothing under the law or the rules of the department and there was no order issued prohibiting such disclosures.

(Weis Dep. Vol. I at 82–84, 85–86.)

Plaintiffs correctly argue that even if the DFI had ordered defendants to violate the federal securities laws, it would not constitute a defense. Similarly, any Utah law that forbade defendants from disclosing the truth to plaintiffs would have been preempted by the federal securities laws. *See Savage v. Jones*, 225 U.S. 501, 533, 32 S.Ct. 715, 725, 56 L.Ed. 1182 (1912) (stating preemption doctrine). Furthermore, although the DFI may have forbidden defendants from disclosing the imminent closure of the thrifts, defendants have not pointed to anything in the record that supports their claim that the DFI prohibited them from complying with federal securities laws. Accordingly, defendants' motion for summary judgment should be denied on this issue.

## VI. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### A. *Controlling Person Liability*

Plaintiffs Ernest R. Gates, Linda Gates, Michael W. Edwards, Debra Edwards, Theodore Scharrier, and Marianne Scharrier have moved for partial summary judgment against defendant Beckstead on the issue of section 12(1) liability based on CST & L's failure to file a registration statement.

Section 12(1) provides that a person who offers or sells a security in violation of section 5 is liable to the purchaser who may recover the purchase price of the security plus interest, less the amount of any income received. 15 U.S.C. § 77*l*(1). The pertinent part of section 5 provides as follows:

(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

. . . .

(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any

prospectus or otherwise any security, unless a registration statement has been filed as to such security. . . .

15 U.S.C. § 77e.

Plaintiffs seek to impose liability upon defendant Beckstead as a controlling person under section 15 which provides as follows:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o.

■■ A plaintiff may establish a prima facie violation of section 5 by proving the following three elements: (1) an offer or sale of securities, (2) absence of a registration statement, and (3) use of the mails or facilities of interstate commerce in connection with the sale or offer. *See San Francisco–Oklahoma Petrol. Explor. Corp. v. Carstan Oil Co.,* 765 F.2d 962, 964 (10th Cir.1985); *SEC v. Murphy,* 626 F.2d 633, 640 (9th Cir.1980). Delivery of a security by mail, confirmation of the sale of a security by mail, or use of a telephone in connection with an offer or sale satisfies the "interstate commerce" requirement. *See Loveridge v. Dreagoux,* 678 F.2d 870, 873–74 (10th Cir.1982); *United States v. Wolfson,* 405 F.2d 779, 783–84 (2d Cir.1968), *cert. denied,* 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969); *Schillner v. H. Vaughan Clarke & Co.,* 134 F.2d 875, 878 (2d Cir.1943); *Leiter v. Kuntz,* 655 F.Supp. 725, 726–27 (D.Utah 1987). Once the plaintiff makes out a prima facie case that the securities at issue were unregistered, the defendant bears the burden of showing that he is entitled to an exemption. *Busch*

*v. Carpenter,* 827 F.2d 653, 656 (10th Cir. 1987).

The Tenth Circuit has held that a director and sole shareholder of a corporation is a controlling person within the meaning of the Act even though he did not participate in running the company. *Carstan,* 765 F.2d at 964. However, a defendant will not be subject to liability as a controlling person if he has "no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o. The burden is on the defendant to establish lack of knowledge. *Carstan,* 765 F.2d at 964. In *Carstan,* the court stated that as a director, the defendant "had the duty to know the basic or sole function for the corporation—the sale of undivided interests—and how this was being carried out—by mail—and whether this was in accordance with the basic statutory requirements." *Id.* The court found that the defendant was liable because he had the power and authority to exercise control even though he may not have exercised the power. *Id.* at 965. *See also Richardson v. MacArthur,* 451 F.2d 35, 41–42 (10th Cir.1971) (control person liability only requires means of discipline or influence, not actual direction).

■■ Plaintiffs have shown that CST & L sold unregistered securities through the mails, over the telephone, and by advertising in newspapers with interstate circulation. (Pls.' Answers to Defs.' (Lorin Moench & Richard Moench) 1st Set of Interrogs., no. 24; Beckstead Dep. at 10–11, 16–18, 42; Bradford Dep. Ex. 3; Wheat Dep. at 5–10; Wheat Dep. Ex. 2; Kelsey Aff., Pls.' Ex. F.; Affs. of Gates, Edwards, and Scharrier, Pls.' Ex. H.)

The evidence presented by plaintiffs shows that defendant Beckstead thought of forming a thrift, discussed the idea with defendant Lorin Moench, and agreed with Moench to establish a thrift. (Beckstead Dep. at 6–7.) In the beginning, defendant Beckstead and defendant Moench Investment Company each owned 50% of the CST & L stock. (*Id.* at 7.) Later on, CSFC owned 100% of the CST & L stock and

**1496**

defendant Beckstead owned 50% of CSFC stock. (L. Moench Dep. at 30.) Defendant Beckstead was an incorporator of CST & L, (L. Moench Dep., Ex. 3 at control no. 6 1141), president and a member of the Board of Directors of CST & L from its creation until July 31, 1986, (Beckstead Dep. at 57; L. Moench Dep., Ex. 3 at control nos. 6 1139–40), and an officer and director of CSFC from the date of its formation until he resigned in August or September 1986. (Beckstead Dep. at 60, Ex. 30; Def. Beckstead's Answer to Pls.' 1st Set of Interrogs. no. 1a.) In addition, defendant Beckstead served as Chairman of the Board of CST & L from the time Lorin Moench resigned in 1985 until September 1986. (Def. Beckstead's Answer to Pls.' 1st Set of Interrogs. no. 2a.)

Defendant Beckstead testified that he was responsible for the daily operations of CST & L. (Beckstead Dep. at 8.) He also determined the types of transactions in which CST & L would engage, whether material information would be disclosed to investors, and whether CST & L securities would be registered. (L. Moench Dep. at 25, 27, 28, 33, 34–35, 41, 43, 50, 59, 60, 63, 80–81, 83; Beckstead Dep. at 11.)

Plaintiffs have established that defendant Beckstead knew that CST & L was issuing IRA certificates, thrift certificates, and passbook savings accounts and that the funds invested by CST & L depositors were used to make loans to others. (L. Moench Dep. at 37–39; Beckstead Dep. at 16–18, 36–37; Sutton Dep. Ex. 111; L. Moench Dep. Ex. 3, at 1.) Further, plaintiffs have shown that defendant Beckstead knew that the securities were not registered and that he was responsible for determining whether a registration statement should be filed. (Beckstead Dep. at 42–43.)

Defendant Beckstead not only had the authority and power to exercise control which is sufficient to establish control person liability, *Carstan*, 765 F.2d at 965, but the evidence shows that he exercised control. In addition, plaintiffs have shown that CST & L violated section 5 by selling unregistered securities through the use of the facilities of interstate commerce and

the mails. Accordingly, plaintiffs have established a prima facie case against defendant Beckstead as a controlling person within the meaning of section 15. However, defendants contend that defendant Beckstead is not liable because the CST & L securities were entitled to an exemption.

**B. Banking Exemption**

Defendants contend that the CST & L securities were exempt from registration under section 3(a)(2) of the 1933 Act which provides in relevant part as follows:

> Except as hereinafter expressly provided, the provisions of this subchapter shall not apply to any of the following classes of securities:
>
> (2) [A]ny security issued or guaranteed by any bank.... For purposes of this paragraph, ... the term "bank" means any national bank, or any banking institution organized under the laws of any State, territory, or the District of Columbia, the business of which is substantially confined to banking and is supervised by the State or territorial banking commission or similar official....

15 U.S.C. § 77c(a)(2). (See Defs.' Reply Mem. at 63–71.)

A party claiming an exemption from registration bears the burden of proving that the exemption applies. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953). In light of the Act's remedial purposes, the exemption provisions should be narrowly construed. *Busch*, 827 F.2d at 656; *Quinn & Co. v. SEC*, 452 F.2d 943, 945–46 (10th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2059, 32 L.Ed.2d 344 (1972).

**1. Case Law**

Apparently, only one case, *Capital Funds, Inc. v. SEC*, 348 F.2d 582 (8th Cir.1965), has dealt with the precise question whether an industrial loan corporation qualifies as a "bank" within the meaning of section 3(a)(2). In *Capital Funds*, the court determined that two qualifications are necessary to meet the requirements of the banking exemption: (1) organization

and supervision under the state banking authority, and (2) business substantially confined to banking. *Id.* at 586. The court stated that the first requirement was perhaps satisfied because industrial loan corporations were under the supervision of the State Bank Commissioner. *Id.* However, the court concluded that the industrial loan corporation in *Capital Funds* was not a bank because its banking activities were too limited and because state law distinguished between banks and industrial loan corporations.

Defendants contend that unlike the industrial loan corporation in *Capital Funds*, CST & L meets both requirements for a section 3(a)(2) exemption set forth by the court in that case: (1) CST & L was subject to the supervision of the DFI; and (2) its business was substantially confined to banking functions.

First, defendants state that CST & L was organized and supervised under state banking authority. In support of this contention, defendants state that all Utah financial institutions are regulated under the Financial Institutions Act pursuant to essentially parallel regulations.

Second, defendants state that CST & L's activities were substantially confined to banking, thus satisfying the second part of the *Capital Funds* test. CST & L was chartered as a Utah Industrial Loan Corporation under the Financial Institutions Act. Under the Act, Utah industrial loan corporations were authorized to provide a wide variety of services characterized by defendants as "banking services." These services included acceptance of deposits (other than demand deposits) in negotiable order of withdrawal (NOW) accounts and thrift savings accounts, the issuance of thrift certificates and nonnegotiable tax-exempt savings certificates (All Savers Certificates), the making of consumer, commercial, and real estate loans, the sale of money orders and travelers' checks, and the performance of other non-fiduciary banking functions.

The Tenth Circuit has twice considered whether an industrial loan corporation qualifies as a bank, although not in the context of the banking exemption. In construing the definition of "bank" for purposes of the excess profits tax, the Tenth Circuit concluded that industrial loan corporations are not banks. *Jackson Finance & Thrift Co. v. Commissioner,* 260 F.2d 578, 582 (10th Cir.1958). The pertinent portion of the statute construed by the *Jackson* court provided as follows:

> a bank or trust company incorporated and doing business under the laws ... of any State ..., a substantial part of the business of which consists of receiving deposits and making loans and discounts ... and which is subject by law to supervision and examination by State, Territorial or Federal authority having supervision over banking institutions.

*Id.* (ellipses in original) (quoting section 104 of the Internal Revenue Code).

The *Jackson* court stated that under Utah law, industrial loan corporations were supervised by the State Bank Commissioner and to that extent fell clearly within the definition of a bank. In addition, the court stated that it would be unrealistic to ignore the similarity between the functions of banks and industrial loan corporations. *Id.* However, the court concluded that industrial loan corporations are not banks. First, the court stated that depositors place their money in banks primarily for safekeeping while they buy thrift certificates as investments. In support of this observation, the court noted that industrial loan corporations pay a higher rate of interest than banks, but with a concomitant risk. *Id.* Second, the court noted distinctions in Utah law between banks and industrial loan corporations. *Id.*

The Tenth Circuit has also considered whether industrial loan corporations fall within the definition of "banks" under the Bank Holding Company Act. *First Bancorporation v. Board of Governors of Federal Reserve System,* 728 F.2d 434 (10th Cir.1984). The Bank Holding Company Act defines "bank" as an institution "which (1) accepts deposits that the depositor has a legal right to withdraw on demand and (2) engages in the business of making commercial loans." 12 U.S.C. § 1841(c). Because Utah law specifically

**1498**

prohibits industrial loan corporations from accepting demand deposits, the court concluded that they cannot be considered banks under the Act. *First Bancorporation*, 728 F.2d at 436. *See also In re Republic Trust & Sav. Co.*, 59 B.R. 606, 612 (Bkrtcy.N.D.Okla.1986) (relying on distinctions in Oklahoma law between banks and trust companies to conclude that a trust company was not a "bank" under the bankruptcy code); *City Loan & Sav. Co. v. United States*, 177 F.Supp. 843, 850 (N.D.Ohio 1959) (concluding that a building and loan association was not a "bank" under section 104 of the Internal Revenue Code because of distinction between banks and building and loan associations in Ohio statutes), *cert. denied*, 287 F.2d 612 (6th Cir.1961).

Defendants contend that the *Jackson* court based its decision on now outdated Utah statutes. Specifically, of four statutory distinctions mentioned by the *Jackson* the court, only the provision that industrial loan corporations may not call themselves "banks" is still applicable. Defendants also note that four years after the *Jackson* decision, the Ninth Circuit concluded that industrial loan corporations are banks for purposes of the excess profits tax. *Commissioner v. Valley Morris Plan*, 305 F.2d 610 (9th Cir.1962), *cert. denied*, 371 U.S. 922, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962). The Ninth Circuit criticized *Jackson* as being largely influenced by Utah law. *Id.* at 621. In addition, the Ninth Circuit disagreed with *Jackson*'s reasoning that depositors are motivated by the higher interest rates offered by thrifts rather than finding a safe place for their money. *Id.* at 623. Defendants contend that because of the changes in Utah law, and the decision in *Valley Morris Plan*, *Jackson* is not very useful authority.

Notwithstanding defendants' contention, *Capital Funds*, the only case to address the issue, held that for purposes of the banking exemption, industrial loan corporations are not "banks." *Capital Funds*, 348 F.2d 582. Furthermore, as discussed above, the Tenth Circuit has twice concluded that industrial loan corporations are not banks in other contexts. Although the Ninth Circuit reached the opposite conclusion, criticizing *Jackson* in the process, this court is bound by Tenth Circuit precedent.

### 2. SEC No-action Letters

██ In support of their contention that industrial loan corporations should be treated as banks, defendants have submitted several SEC no-action letters in which the SEC agreed not to take action against a Utah industrial loan corporation, and similar entities from other states, with respect to the issuance of securities. See *Citicorp Person-to-Person Fin. Center of Utah*, SEC No-Action Letter, [1982–83 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 77,385 (February 24, 1983); *Continental Fin. Corp. of America*, SEC No-Action Letter, [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82, 131 (April 10, 1979); *Foothill Thrift & Loan*, SEC No-Action Letter, (August 3, 1988), *available in* LEXIS; *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, (September 28, 1983), *available on* WESTLAW, FSEC–NAL database *and in* LEXIS; *Fort Collins Person-to-Person Indus. Bank*, SEC No-Action Letter, (June 11, 1979), *available in* LEXIS.

Plaintiffs have submitted letters in which the SEC refused to take a no-action position with respect to inquiries involving industrial loan corporations engaged in activities similar to those of the thrifts in defendants' no-action letters. See *Commercial Credit Company*, SEC No-Action Letter, [1971–72 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 78,544 (November 5, 1971); *Union Trust, Inc.*, SEC No-Action Letter, (February 14, 1972) *available on* WESTLAW, FSE–NAL database *and in* LEXIS; *Valley Sav. & Loan Co.*, SEC No-Action Letter, (April 23, 1975), *available on* WESTLAW, FSE–NAL database *and in* LEXIS.

The fact that the SEC issued no-action letters in regard to specific requests does not mean that all industrial loan corporations fall within the banking exemption. Each letter represents the decision of the SEC not to enforce the securities laws in that particular case. For example, the *Citicorp* letter states that it only expresses the SEC's position on enforcement and

does not purport to give a legal opinion on the question presented. *Citicorp,* [1982–83 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 77,385, at 78,420. As plaintiffs point out, the no-action determination is based on the representations of counsel for the entity seeking an exemption. In each case submitted by defendants, the entity represented to the SEC that its deposits were covered by insurance. In the case of *Foothill Thrift & Loan,* the deposits were insured by the FDIC. In most of the no-action letters, the SEC expressly relied on the existence of insurance of one kind or another. In short, the no-action letters submitted by defendants do not establish that industrial loan corporations are banks for purposes of the section 3(a)(2) exemption.

3. Statutory Distinctions Between Thrifts and Banks

For purposes of this discussion, all references to Utah statutory provisions are to those in effect at the time relevant to this suit. As plaintiffs point out, substantial differences still exist between banks and industrial loan corporations under Utah law. For example, the definition of "bank" in the Utah Code expressly excludes thrift institutions. Utah Code Ann. § 7–1–103(1) (1988). Conversely, the definition of "thrift institution" expressly excludes banks, savings and loans, and credit unions. Utah Code Ann. § 7–1–103(36) (1988). "Thrift institution" is defined as "any industrial loan corporation" authorized to receive deposits and which is a member of the guaranty corporation or has its accounts insured by a federal deposit insurance agency. *Id.*

In defining "banking business," the Code expressly states that a thrift institution is not "considered to be a bank subject to the provisions of this title applicable to banks." Utah Code Ann. § 7–3–3 (1988). Further, industrial loan corporations are regulated separately from banks and are prohibited from using the name "bank" in their names or advertisements. *Id.* See Utah Code Ann. §§ 7–3–1 to –39 (regulating banks); §§ 7–8–1 to –18 (regulating industrial loan corporations).

In his deposition, DFI Commissioner George Sutton testified concerning the differences between banks and other financial institutions. According to Sutton, two important differences are that (1) banks can offer "demand accounts" to the public, and (2) bank deposits must be insured by the FDIC. (Sutton Dep., Vol. I at 28–31.) As plaintiffs point out, the fact that banks were required to have FDIC insurance, while industrial loan corporations were not, creates a significant distinction between the two types of financial institutions.

Finally, it is significant that section 3(a)(5) of the 1933 Act specifically exempts securities issued by certain non-bank financial institutions including savings and loan associations, building and loan associations, cooperative banks, and homestead associations, but fails to mention industrial loan corporations. See 15 U.S.C. § 77c(a)(5). The fact that Congress created a separate exemption for these non-bank institutions demonstrates that although they might be similar to banks, Congress did not consider them to fall within the banking exemption. Industrial loan corporations do not appear to be more similar to banks than the institutions exempted under section 3(a)(5).

Based on the case law and the statutory distinctions between thrifts and banks, the court concludes that the securities issued by CST & L were not exempt under section 3(a)(2).

C. *Conclusion*

Plaintiffs have established that CST & L sold unregistered securities by means of the facilities of interstate commerce and the mails. Further, they have shown that defendant Beckstead was a controlling person within the meaning of section 15. Finally, the CST & L securities were not entitled to an exemption under section 3(a)(2). Accordingly, the motion of plaintiffs Ernest R. Gates, Linda Gates, Michael W. Edwards, Debra Edwards, Theodore Scharrier, and Marianne Scharrier for partial summary judgment against defendant Beckstead on the issue of liability on their section 12(1) claim should be granted.

VII. RICO ENTERPRISE

Defendants state that plaintiffs have failed to allege an "enterprise" dis-

tinct from the "persons" alleged to be liable for racketeering. In addition, defendants state that plaintiffs have not identified the alleged RICO "enterprise" with any specificity. Defendants, therefore, request that plaintiffs' RICO/RICE claims be dismissed.

Plaintiffs have attempted to state RICO claims under 18 U.S.C. § 1962(a), (b), (c), and (d). To state a RICO claim under section 1962(c), a plaintiff must allege an "enterprise" distinct from the liable "persons" who engaged in a pattern of racketeering activity. *Garbade v. Great Divide Mining & Milling Corp.*, 831 F.2d 212, 213 (10th Cir.1987); *Haroco, Inc. v. American Nat'l Bank & Trust Co.*, 747 F.2d 384, 399–402 (7th Cir.1984), *aff'd on other grounds*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). *Bradford v. Moench*, 670 F.Supp. at 930; *Grant v. Union Bank*, 629 F.Supp. 570, 574 (D.Utah 1986). However, under section 1962(a), a defendant corporation which was a beneficiary of the racketeering activity can be both the "enterprise" and a liable "person." *See e.g.*, *Garbade*, 831 F.2d at 213; *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 840–41 (4th Cir.1990); *Haroco*, 747 F.2d at 402. Courts have also held that a corporation can be both a person and an enterprise under section 1962(b). See *Landry v. Air Line Pilots Ass'n Int'l AFL–CIO*, 901 F.2d 404, 425 (5th Cir.1990), *cert. denied*, 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990); *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1307 (7th Cir.1987), *cert. denied*, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989); *Wilcox v. First Interstate Bank*, 815 F.2d 522, 529 (9th Cir.1987); *Schreiber Distrib. Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1398 (9th Cir.1986). A person is subject to liability under subsection (d) if he conspires to violate any of the preceding three subsections.

After defendants filed their motion for summary judgment, the court granted plaintiffs leave to file a third amended complaint. In their third amended complaint, plaintiffs allege that defendants Lorin L.

Moench, Moench Investment Company, Ltd., Beckstead, Olsen, Richard Moench, Taggart, CSFC, and John and Jane Does I–X are the liable "persons" and that CST & L is the "enterprise" involved in their RICO/RICE claims. These allegations are sufficient to satisfy the requirement that the "enterprise" be distinct from liable "persons" for the purposes of RICO. Since this court has previously held that the pleading standards for RICO and the Utah RICE Act are the same, *Bradford*, 670 F.Supp. at 928, the allegations also satisfy the pleading requirements for the RICE Act.[5] Utah Code Ann. §§ 76–10–1601 to –1605 (1990). Accordingly, defendants' motion for summary judgment should be denied on the RICO/RICE claims.

## VIII. RECOMMENDATION

The instruments issued by CST & L are securities within the meaning of the Federal Securities Acts. Regarding plaintiff's 12(1) claim, the court should hold that the three-year limitation provision does not apply because unregistered securities are not "bona fide offered to the public." Alternatively, the court should either adopt the approach that the relevant offering occurs at the time the securities were *last* offered to the public or follow its earlier statement that the relevant time is when the securities are first offered to the *plaintiff*. Finally, if the court adopts the first-offered approach, a genuine issue of material fact exists as to whether the nature of the investment in CST & L securities changed so significantly in the three years prior to the filing of the complaint as to constitute the offering of a new security. Accordingly, if the court takes the first-offered approach, the matter should be set for trial on the issue of whether new securities were offered during the three years prior to suit.

On plaintiffs' section 12(2) claims, each reinvestment of the funds from matured certificates in new certificates and each investment of additional amounts in passbook accounts constituted a sale of a secu-

---

**5.** The RICE Act is now known as the Pattern of Unlawful Activity Act. See Utah Code Ann. § 76–10–1601 et seq. (1990).

rity. Consequently, plaintiffs' section 12(2) claims and their claims under the Utah Uniform Securities Act are not time-barred.

Plaintiffs have sufficiently alleged a distinction between the liable "persons" and the "enterprise" to state RICO/RICE claims. Accordingly, defendants' motion for summary judgment should be denied on all issues.

No genuine issue of material fact exists on plaintiffs' section 12(1) claim against defendant Beckstead. Therefore, partial summary judgment should be entered in favor of plaintiffs Ernest R. Gates, Linda Gates, Michael W. Edwards, Debra Edwards, Theodore Scharrier and Marianne Scharrier against defendant Beckstead on the issue of liability under section 12(1).

Copies of this Report and Recommendation are being mailed to the parties, who are hereby notified that they have the right to object to the Report and Recommendation. The parties are further notified that they must file any objections to the Report and Recommendation within ten (10) days after receiving it.

DATED this 25th day of February, 1992.